## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| AARON S. MOHAMMED, | ) | |
| PLAINTIFF | ) | CASE NO. |
| | ) | |
| VS. | ) | |
| | ) | COMPLAINT |
| CREIGHTON UNIVERSITY, | ) | (JURY DEMAND) |
| DR. JUN XIA, DR. YUSI FU, | ) | |
| DEFENDANTS. | ) | |

*COMES NOW*, Plaintiff, AARON S. MOHAMMED, by and through his attorney, John D. Cartier, files their Complaint complaining of the acts of Creighton University, Dr. Jun Xia, and Dr. Yusi Fu ("Defendants"). Plaintiff requests a trial by jury, and for his cause(s) of action against the Defendants, state and alleges as follows:

### JURISDICTION AND VENUE

1.      This matter arises under federal and state law. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3). This Court has supplemental jurisdiction to hear and decide the pendent state law claims under 28 U.S.C. § 1367.

2.      This Court has supplemental jurisdiction to hear and decide the pendent state law claims under 28 U.S.C. § 1367.

3.      Venue in the District of Nebraska is properly laid pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions alleged herein, which form the factual and legal basis of the claims of the Plaintiff, arose or occurred within the geographical limits of this District.

4.      Plaintiff has met the administrative requirements of this action in that he filed a charge of discrimination with the Nebraska Equal Opportunity Commission and the Equal Employment Commission and received a Notice of Right to Sue and timely filed suit with this Court.

### PARTIES

5.      Plaintiff, Aaron Mohammed, an Indo-Caribbean-American man, is a resident and citizen of Omaha, Douglas County, Nebraska and was at all times pertinent hereto, an "employee" of the Defendant(s) within the meaning of FEPA, Title VII, and Neb. Rev. Stat. § 48-1104.

6.     Defendant Creighton University is a Nebraska nonprofit corporation, having its principal place of business at 2500 California Plaza, Omaha, NE 68178.

7.     Defendant Dr. Jun Xia, was at all relevant times a resident of Nebraska and the Assistant Professor and the Innovative Genomics and Bioinformatics Core Co-Director.

8.     Defendant, Dr. Yusi Fu, was at all relevant times a resident of Nebraska and Plaintiff's supervisor with the title Research Assistant Professor and the Innovative Genomics and Bioinformatics Core Co-Director.

## GENERAL ALLEGATIONS

9.     On or about August 16, 2022, Plaintiff was hired by Dr. Yusi Fu as a Senior Program Coordinator for the Lynch Cancer Research Center. At that time, she was a Research Assistant Professor and was the Director of the Innovative Genomics and Bioinformatics Core ("IGBC") facility.

10.     Dr. Fu explained to him that his role would primarily be that of a Bioinformatician who manages the IGBC, fulfills data analysis services requested by IGBC users, and carries out data analysis for Fu/Xia lab projects.

11.     Plaintiff's first day of work at Creighton University was October 3, 2022 and Dr. Fu was his supervisor.

12.     On February 28, 2023, Dr. Fu and her husband, Dr. Jun Xia, became Co-Directors of the IGBC. Dr. Fu remained Plaintiff's sole supervisor.

13.     Plaintiff began keeping recording devices on him while at work on March 6, 2023, due to Dr. Xia's harassment of him.

### *Hostile Confrontation Regarding Overtime*

14.     On October 3, 2022, Plaintiff asked Dr. Fu if he gets paid for overtime work. She told him no and instructed Plaintiff to enter 8 hours for each day of work regardless of the amount of time Plaintiff actually worked.

15.     Dr. Fu told Plaintiff that if he worked overtime, she would give him extra time off for the overtime hours worked.

16.     On March 10, 2023, Plaintiff found out that he was supposed to receive overtime pay during a meeting with Ms. Michele Wafer from Human Resources ("HR"). The main purpose of this meeting was to discuss an incident that took place on March 1, 2023, with Dr. Jun Xia, Dr. Fu's husband. This was the first meeting Plaintiff had with HR to discuss Dr. Xia's behavior towards him.

2

17.    During this meeting, Plaintiff made a comment about working a lot of overtime and Ms. Wafer asked Plaintiff if he got paid for it. Plaintiff explained that Dr. Fu told him that he does not get paid for overtime. Ms. Wafer then informed him that was not true and that he should be getting compensated for overtime work.

18.    Ms. Wafer told him he needed to officially report the number of overtime hours he worked so that he could get paid for it, but Plaintiff was reluctant to do so out of fear of retaliation. She assured him that retaliation would not be tolerated.

19.    Through email correspondence and during multiple follow up meetings, Ms. Wafer continued to encourage Plaintiff to determine the number of overtime hours he worked and report them as unpaid; Plaintiff continued to express fear that it would lead to retaliation. Because Ms. Wafer reassured him multiple times that retaliation would not be tolerated, he decided to go through with officially reporting them.

20.    During a meeting with Ms. Wafer on April 14, 2023, she advised Plaintiff to let Dr. Fu know that he will be reporting actual hours worked from now on and would need approval for overtime, since it would involve extra compensation.

21.    Plaintiff expressed to Ms. Wafer that he was afraid of how Dr. Fu and Dr. Xia would react to becoming aware of his involvement with HR right after the incident with Dr. Xia on March 1, 2023. Plaintiff then explained to Ms. Wafer that he planned to tell Dr. Fu that he found out about this after reaching out to HR for help with filling out a job description form that he and Dr. Fu were tasked with filing out.

22.    At 1:00 p.m. on April 17, 2023, Plaintiff informed Dr. Fu that he became aware he was owed payment for overtime hours and sent documentation to HR that showed how much overtime he had worked.

23.    At 1:09 p.m. Plaintiff emailed Dr. Fu what he had sent to HR to show he had accumulated overtime pay.

24.    At 1:14 p.m. on that same day, Dr. Xia had a hostile confrontation with Plaintiff.

25.    Dr. Xia aggressively stomped into Plaintiff's office at a fast pace, was breathing heavily, glaring at Plaintiff, with his hands shaking, and his body swaying side to side.

26.    He began to question Plaintiff about why he had sent overtime documents to HR.

27.    During this confrontation, Dr. Xia raised his voice at Plaintiff multiple times and repeatedly cut him off as Plaintiff tried to speak.

28.    Plaintiff felt in danger of being physically assaulted. Plaintiff told Dr. Xia that before he gets upset and tries to intimidate him, he needs to relax.

29.    Dr. Xia then stepped towards Plaintiff while whispering, "okay, okay, yeah, yeah."

30.    It appeared that Dr. Xia was going to put his hands on Plaintiff, and Plaintiff shouted, "Do not put your hands on me again!"

31.    Plaintiff said "again" because on March 6, 2023, Dr. Xia placed his hands on Plaintiff and massaged him.

32.    Dr. Xia repeatedly said that Dr. Fu telling Plaintiff that he didn't get paid for overtime was a misunderstanding or miscommunication.

33.    That was not the truth for these reasons:

    A. Plaintiff asked him if they knew that he was non-exempt, and he laughed and said, "I'm not sure I don't know that's what these timesheets are for"

    B. Ms. Wafer had told Plaintiff that only non-exempt employees at Creighton need to fill out timesheets

    C. Plaintiff then asked Dr. Xia why Dr. Fu told Plaintiff that he could not get paid for overtime if she was unsure. At first, he responded saying, "I mean there's a budget limit." But then he stuttered and quickly said, "I don't know, I think there's just some miscommunication there. We are all new to the job [so] we don't know."

    D. This made it clear to Plaintiff that Dr. Fu told him what she did because she wanted him to work overtime without exceeding the budget limit.

34.     At this point, Dr. Xia said, "No big deal." And Plaintiff responded by saying I hope not because rushing at him and yelling at Plaintiff was scary.

35.    Plaintiff told Dr. Xia that was uncalled for and he hopes it never happens again.

36.    Dr. Xia responded by saying he was sorry and that it was due to how "passionate" he can be.

37.    Dr. Xia also told Plaintiff that his reaction was due to him being surprised and that he and Dr. Fu do not like surprises.

38.    Plaintiff responded by pointing out what had just happened, then asked him how he thinks he would have reacted if Plaintiff had let him know that he was planning on submitting those documents to HR. Dr. Xia then admitted that he overreacted and apologized again.

4

39.     Dr. Xia said the way he behaved did not reflect his "true feelings" about Plaintiff.

40.     Plaintiff believes that this did reflect his true feelings, especially considering the offensive comments he made to Plaintiff regarding "brown people" on March 14, 2024.

41.     Plaintiff immediately reported this situation to Ms. Wafer, and she instructed Plaintiff during a phone call to take the rest of the day off, and he was given permission to work remotely during the next 2 days.

42.     This was not the first time Dr. Xia was hostile towards Plaintiff.

43.     Dr. Xia's impulsivity caused Plaintiff a lot of anxiety and fear for his safety.

### *Discrimination and Harassment*

44.     Throughout Plaintiff's time in his position, he has faced repeated harassment from Dr. Xia.

45.     Plaintiff first notified HR about Dr. Xia's harassment of him on March 6, 2023, but asked them to keep it confidential.

46.     Plaintiff believes this harassment was due to the color of his skin based on derogatory comments he made to Plaintiff regarding people with brown skin color.

47.     On March 14, 2023, around 12:15 p.m. and while they were alone together, Dr. Xia began talking about the concept of certain individuals being privileged in academia and then told Plaintiff, "People these days, they don't like Asians and they don't like White people, they like brown people because it's diversity."

48.     Shortly after, while Dr. Xia was speaking about another individual, who according to him is Mexican, he said, "They just looked brown and then got a lot of fellowships."

49.     The month of January 2023, was when Dr. Xia began treating Plaintiff poorly.

50.     The first kinds of interactions Plaintiff noticed involved situations where Dr. Xia would explain something he wanted Plaintiff to do, but then cut him off mid-sentence to answer questions he was in the middle of asking to get clarification.

51.     There were times where Dr. Xia would finish explaining something to Plaintiff, and Plaintiff would attempt to recap what was explained to him to ensure that he understood. Dr. Xia would cut Plaintiff off and say, "Yeah, yeah, yeah, just do it." Dr. Xia would speak to Plaintiff this way while sometimes making a shoo-away

gesture at Plaintiff with his fingers. Plaintiff felt like Dr. Xia did not respect him and treated him like a servant rather than as a colleague.

52.    Plaintiff felt harassed by these interactions because they were exhausting, and stressful. Constantly cutting Plaintiff off while he was seeking clarification or trying to be sure he understood directions clearly would increase the likelihood of ending up in a position where Dr. Xia would criticize him.

### *First Example of Dr. Xia Setting a Trap for Criticism*

53.    On February 2, 2023, approximately 9:26 a.m., Plaintiff emailed a billing spreadsheet to Mr. Ray Stoupa, the Chief Financial Officer for Creighton. This spreadsheet contained the funding account number or "fund-org #" of each Professor who utilized the services of the IGBC during the previous month of January and how much they should be charged.

54.    Immediately after sending the email, Plaintiff went into Dr. Fu's office to let her know that he sent the spreadsheet to Mr. Stoupa. After reviewing the spreadsheet, Dr. Fu told Plaintiff that Dr. Xia was planning on splitting his payment using two fund-org #'s, something Plaintiff did not know was possible at that time.

55.    Plaintiff told her that he could email Mr. Stoupa and let him know, but she instructed Plaintiff to not do that and told him to go to Dr. Xia's office and let him know instead.

56.    Plaintiff went to Dr. Xia's office no later than 9:35 a.m. to let him know that he only listed one fund-org # for him.

57.    After Dr. Xia mentioned that he told Plaintiff before that Plaintiff should ask him what was fund-org # he planned to use each month to pay his bill since it could change, Plaintiff responded by apologizing and said he'll notify Mr. Stoupa that Dr. Xia wanted to split his payment. Dr. Xia told Plaintiff not to do that.

58.    Then Dr. Xia appeared to get an excited look on his face, claimed that Plaintiff tends to forget things, and asked Plaintiff why he forgets things so much. Dr. Xia began to say to Plaintiff, "You always…" But then stopped himself and appeared to think.

59.    Dr. Xia then continued in a very sarcastic tone and said, "I guess everyone makes mistakes, but what do you do to keep yourself from forgetting things? I write things down on my board. What do YOU do Aaron?"

60.     Plaintiff responded by saying that he also writes things down too, and Dr. Xia responded by exclaiming, "Ugh! Well I guess that's not working out for you now is it?!"

61.     Plaintiff remembers Dr. Xia's behavior vividly because it was unsettling on how much he appeared to enjoy criticizing Plaintiff, as he had an amused look on his face and excitement in his voice.

62.     Plaintiff felt harassed on this day, and it caused him a great deal of stress. Not simply because Dr. Xia criticized Plaintiff, but because:

   A. He appeared to be happy for the opportunity, as if eagerly waiting for it;
   B. He kept saying Plaintiff was a forgetful person even though he had not forgotten anything during his first 4 months of work;
   C. He raised his voice at Plaintiff for something he could have easily fixed by reaching out to Mr. Stoupa;

63.     This is the first example of Dr. Xia setting up a trap for opportunity to criticize Plaintiff because:

   A. On November 11, 2022, Dr. Xia told Plaintiff to consult with him about how he plans to pay his bill at the end of each month since the fund-org # may be different each month. Plaintiff followed this instruction for November's and December's bill.
   B. On January 16, 2023, Dr. Xia sent Plaintiff an email containing the fund-org # he planned on using for his bill.
   C. On January 30, 2023, Dr. Xia sent Plaintiff an email notifying him that his lab technician, Ms. Shiwei Yin, will be sending him the fund-org # he planned to use for his bill. On January 31, 2023, Ms. Yin sent Plaintiff the number and it was the same one Dr. Xia sent on the 16th. Plaintiff assumed that Dr. Xia forgot that he already emailed it.
   D. Plaintiff also naturally assumed that Dr. Xia was informing him of the fund-org # he was planning on using for his bill that month so that Plaintiff would not need to ask.
   E. It turned out that Dr. Xia only planned to use that account to pay for his "Sequencer usage" and planned on using a different one for his "TapeStation usage".
   F. Plaintiff was never told it was possible for IGBC users to split their bill using multiple funding accounts.

G. During the month that bill was associated with, Dr. Xia informed Plaintiff the fund-org # he planned on using for his Sequencer usage twice in advance, but did not do so a single time for his TapeStation usage in order to mislead Plaintiff and set him up for an opportunity to criticize him.

### *Second Example of Dr. Xia Setting a Trap for Criticism*

64.    There was an incident where Dr. Xia invited Plaintiff to ask questions regarding the ownership of certain sequencing samples and then berated him for doing so. Plaintiff stood up for himself by asking Dr. Xia to explain what he did wrong.

65.    Plaintiff was working remotely from February 27-March 2, 2023, while Dr. Fu and Dr. Xia were away on vacation.

66.    On February 28, 2023, at 10:15 a.m., Dr. Xia invited Plaintiff to let him and Dr. Fu know if he had questions regarding the ownership of certain sequencing samples in an email. Dr. Xia wrote, "*[...] For the sequencing run, cost needs to be splitted proportionally of reads generated, please let us [know] if you have Qs regarding whose samples are from whom.*"

67.    On March 1, 2023, at 9:16 a.m., Plaintiff sent Dr. Fu and Dr. Xia an email asking a question regarding the ownership of the sequencing samples. Plaintiff wrote, "*[...] Also, there were only 2 runs for last month right? Who was 230208 _VH00805_16 AAAMKNKHV for and who was '230201_VHO0805_15 AAAMFGCHV' for?*"

68.    At 10:07 a.m., Dr. Xia berated Plaintiff for asking that question, despite previously inviting Plaintiff to ask questions regarding whose samples were from whom. He wrote, "*moving forward, ask users to register the run with you (and send you the sample information). YOU ACTUALLY DID THE 230208 sample sheet, see attached. Please be more on top of this. You are supposed to know which samples [belong] to which lab at that point. 230201 run: my own kit, $50 charged to me 230208 run: core kit, need to calculate can you extract samples (the names) from the 230208? look into the sample sheet (might be multiple of them) and the final fastg files; once you send the sample names, we will let you know which samples belong to which PI. [...]*"

69.    Plaintiff was never instructed by his supervisor, Dr. Fu, that he needed to gather that information before. Before this incident, whenever Plaintiff was in the process of putting together a billing spreadsheet, Dr. Fu would always tell him which lab each run belonged to and what to charge them. The sample sheet Dr. Xia

referenced did not contain information regarding the ownership of the samples nor did it contain fields for that information to be included.

70.    At 10:16 a.m., in a separate email thread, Dr. Xia wrote, "*i sent you the 0131 (finished on 0201) run info below. please please have a separate file documenting on the sequencer related usage/info. hope this never happens again*"

71.    Plaintiff was confused by Dr. Xia's negative reaction to asking a question about something he invited Plaintiff to ask.

72.    Plaintiff responded to the first email thread stating, "*I see now that the 230201 run was already accounted for during last month's billing. The 230208 sample sheet does not contain the names of who the samples belong to, see attached. [...] You had mentioned that I should let you all know if I have any questions regarding whose samples are from whom, could you let me know what I did wrong so that I can avoid making the same mistake in the future? Attached here is a spreadsheet that contains the sample names for the final fastq files for the 230208 run, please let me know which samples belong to whom.*"

73.    Plaintiff responded to the other email thread stating, "*Could you let me know what was the mistake I made so that I can avoid doing it again in the future? You had mentioned that I should reach out to you all if I had questions. [...] I will be happy to create a new file that keeps track of more details for the sequencer from now on.*"

74.    At 12:47 p.m. Dr. Xia called Plaintiff's cell phone and sent a text stating, "*hi aaron,  please call when you get a chance,  easier to talk on phone than email*".

75.    Plaintiff did not pick up the phone nor respond to the text because it was more appropriate to continue correspondence through email so that there could be a record of what Dr. Xia was communicating to Plaintiff.

76.    At 12:52 p.m., Dr. Xia sent an email stating, "*No mistakes. Please call me when you get a chance. easier to talk over the phone. Thx.*"

77.    At 1:22 p.m., Dr. Xia called Plaintiff's phone again.

78.    At 1:24 p.m., Dr. Xia sent Plaintiff an email letting him know which samples belonged to whom.

79.    Dr. Xia was setting Plaintiff up for criticism when he invited him to ask questions regarding the ownership of sequencing samples. Dr. Xia knew that Plaintiff did not have any way of determining this on his own besides asking someone for that information. This is why he told Plaintiff to send him the sample names so he could tell Plaintiff who they belonged to.

80.    On March 2, 2023, at 4:22 p.m., Dr. Xia sent Plaintiff an email letting him know that he wanted to show Plaintiff how to use a device in the lab called a Qubit fluorometer the next day. Dr. Xia did not specify a time he wanted to meet, nor did he ask Plaintiff what times he was available. Dr. Fu was also cc'd in this email. March 3, 2023, was the day Dr. Xia and Dr. Fu were coming back to work and when Plaintiff would be working in-person again.

81.    On March 3, 2023, at 8:56 a.m., Plaintiff emailed Dr. Fu to let her know that he would be putting in a request for sick leave that day. He submitted the request through "myHR" at 9:44 a.m. and she approved it two minutes later at 9:46 a.m.

82.    Plaintiff took his first sick day since starting this job to avoid potentially being alone with Dr. Xia, because Plaintiff had a gut feeling that Dr.Xia was very upset that he had stood up for himself on March 1, 2023, by asking Dr.Xia to explain what he did wrong. Plaintiff was afraid that Dr. Xia was planning to threaten him in order to scare him or criticize him the same way he did on February 2, 2023.

83.    Plaintiff was uncomfortable emailing Dr. Xia to let him know that he was not going to be able to meet with him because he was afraid that Dr. Xia would try calling and/or texting him again, as Dr. Xia did on March 1, 2023. Plaintiff did not think this would be a problem because:

    A. They had never set up a time to meet for that day.

    B. The first time Dr. Xia ever mentioned plans to train Plaintiff on how to use Qubit was March 2, 2023, at 4:22 p.m.

    C. Dr. Fu, Plaintiff's supervisor, was cc'd in Dr. Xia's email about the Qubit training. Because of this, Plaintiff figured she would very likely let Dr. Xia know that he took a sick day, either while on their way to work together (they are married and normally came into work together at 10 a.m.), during lunch since they always ate together, or whenever Dr. Xia decided to stop by Plaintiff's office (Dr. Fu's office was next door to Plaintiff's).

### *Threatening Comments*

84.    There was an incident where Dr. Xia made threatening comments to Plaintiff and massaged him while doing so.

85.    By this point, Plaintiff had experienced an extreme amount of stress and anxiety each day after what happened on March 1, 2023. Plaintiff kept ruminating about the situation he was in with Dr. Xia and was having feelings of regret that he stood up for himself by asking Dr. Xia to explain what he did wrong.

86.    Plaintiff kept thinking about the look of excitement Dr. Xia made right before berating him on February 2, 2023, and how much Dr. Xia appeared to enjoy doing so. Plaintiff was very fearful of what Dr. Xia was going to say to Plaintiff in person.

87.    Plaintiff had major difficulty getting out of bed, eating, and sleeping. Plaintiff was dreading coming back to work in-person and the night before March 6, 2023, Plaintiff did not sleep at all. He spent that whole night and morning drafting an email he was considering sending to HR. Plaintiff kept going back-and-forth on whether or not he should make HR aware of Dr. Xia's behavior towards him because he was afraid of retaliation.

88.    On March 6, 2023, at 10:20 a.m., Plaintiff sent the email to HR expressing some of his concerns about Dr. Xia and requested a meeting. He later sent another email requesting confidentiality and stated that he would not like anyone outside of HR to hear about this.

89.    Because Plaintiff had a gut feeling Dr. Xia was upset that Plaintiff stood up for himself and was going to threaten him, he brought a recording device to work that day and kept it recording in his pocket the entire day.

90.    Around 3:10 p.m., during the first time Plaintiff saw Dr. Xia in-person after the incident, and while they were alone, Dr. Xia made threatening comments to Plaintiff that had a major negative impact on his mental health.

91.    Dr. Xia began by talking about what happened on March 1, 2023. He asked if Plaintiff had seen the calls he made to him. Plaintiff told him that he did and Dr. Xia asked why he did not pick up.

92.    Plaintiff tried explaining to Dr. Xia that given the context of the emails, he felt it would be more appropriate for the conversation to continue through email, but Dr. Xia cut Plaintiff off before he could finish and told him to just pick up next time. Dr. Xia then said he hates it when people don't pick up his calls and told Plaintiff to send a text message next time or else he'll keep thinking about it.

93.    While speaking about Plaintiff not letting him know Plaintiff took a sick day on March 3, 2023, Dr. Xia said, "*I was a bit pissed that day, which you don't want that–something like that to happen. And people will not tell you when they are pissed, I usually tell them. It's just not nice, you need to tell me you're not coming. Otherwise, [I'll] spend my time preparing for it and then you [don't] show up. You don't want that to happen–for other people. We are friends so it's not a big issue.*"

94.     Dr. Xia continued saying, "*Based on my [ten or twelve] years working with some other big professors, when they are pissed.....you don't want that to happen.....when they are pissed you are done, you are done, like one strike done. [I've] seen that like again and again, so don't do that. Not trying to–I hope–[I'm just trying] to help you avoid some of the issues in the future when you work with others because.....it's okay like we are fine, you are pretty good, you work really hard, but if something happens to your say like your PhD mentor.....the damage when it occurs, it can last forever. Like I still ask for letters from my PhD mentors. Even when I'm a faculty, I still ask them for letters because they need to nominate me for something. It's always–I mean everybody makes mistakes, but that kind of mistake.....it's a bit....damaging. So just just keep an eye on that.*"

95.     Dr. Xia noticed how scared Plaintiff looked, and then started massaging Plaintiff. He alternated between massaging Plaintiff's left shoulder and rubbing circles around his left shoulder blade. His hand did not have constant contact on Plaintiff during that time. He would massage Plaintiff's shoulder, then rub circles around Plaintiff's shoulder blade, then take his hand off for a few seconds, and then repeat. That cycle took place at least 3 times and lasted for about 30 sec – 1 min. This made Plaintiff feel very uncomfortable, but he was too afraid to tell Dr. Xia to stop massaging him out of fear that it would upset Dr. Xia.

96.     Dr. Xia claimed he was only warning Plaintiff about what would happen if he made professors "pissed" because he was trying to help Plaintiff and cares about him, but it did not feel that way to Plaintiff. Dr. Xia told Plaintiff twice that he was "pissed", once while talking about Plaintiff not letting him know that he took the sick day and once while talking about Plaintiff not picking up his cell phone

97.     Dr. Xia also said he uses capital letters to try and scare people and was laughing while saying this. He was referring to his use of all caps in the email he sent Plaintiff at 10:07 a.m. on March 1, 2023.

98.     During this incident, Dr. Xia said one of his reasons for being "pissed' was because he spent time preparing to show Plaintiff how to use the Qubit and Plaintiff didn't let him know that he took time off on March 3, 2023. Dr. Xia's level of anger about this and the resulting threatening comments he made to Plaintiff were completely overblown and unjustified because:

       A. Dr. Xia never ended up showing Plaintiff how to use the Qubit at a later date, showing it was not as important to him as he made it out to be;

B. They had never set up a specific time to meet for that day, so no reasonable person would be "pissed off" about this as he was, especially if they were not Plaintiff's supervisor;

C. The Qubit is a very simple device, so it's unlikely that he spent an amount of time preparing for a demonstration that would have justified his level of anger. During the internal investigation that was later conducted by the Title iX and Civil Rights Compliance Office, Dr. Xia stated, "We didn't really set a time because it doesn't take long to train using that instrument. So, we didn't really set a time because I assume he'll be there and then I can probably stop by and show him. It takes 10, 15 minutes."

D. Dr. Xia himself said it was "not a big issue".

99.    Considering these details, it's clear that Dr. Xia's level of anger and his threats were really the result of him feeling challenged when Plaintiff asked him to let him know what he did wrong on March 1, 2023. His intention was to make Plaintiff afraid of standing up for himself again.

100.    Dr. Xia's bullying of Plaintiff was unfortunately the norm. The following days also had similar incidents, all of which have corresponding recorded evidence to verify the statements and actions of Dr. Xia.

### *March 10, 2023*

101.    There was hostility from both Dr. Fu and Dr. Xia after Plaintiff attempted to get clarification about an upcoming event from Dr. Fu.

102.    Plaintiff was tasked with making a PowerPoint presentation for "Core Fest", an event aimed to increase awareness and usage of the core facilities at Creighton, which would involve people having the opportunity to take tours of each facility. Dr. Fu told him that he would be presenting this PowerPoint at the event. Plaintiff assumed that he and all the other core managers would each be giving presentations about the services their cores offer to an audience on a projector screen.

103.    However, on March 8, 2023, the manager of the flow cytometry core, Dr. Olwenyi (Allan) Omalla, told him that was not the case. He told Plaintiff that for the previous year's Core Fest, there were no presentations, it only involved people walking in and out of each core lab to hear short pitches from the core managers about their services offered. This confused Plaintiff and made him think about how he would be giving the PowerPoint presentation within the IGBC lab.

104.    On March 10, 2023, at 9:49 a.m., Plaintiff attempted to get clarification about this from Dr. Fu after she asked him if he finished the slides for the presentation. He told her he had a question about that. Plaintiff mentioned that he was talking with Dr. Omalla about the event and Dr. Omalla told him it might not actually be a PowerPoint presentation. He then asked where he will be presenting it.

105.    Dr. Fu responded saying, "*what do you mean you talked to Allan?*" Plaintiff then explained what Dr. Omalla told him about the previous year's Core Fest and then asked Dr. Fu if he'll have a screen, referring to a projector screen. She said, "*Of course, we have a lot of computers here, why we can't have a PowerPoint?*"

106.    Plaintiff sensed that Dr. Fu was getting upset with him and began to stutter out of nervousness. He then said, "*So yeah I was actually planning on asking you more about that, just um, like uh, so it should be PowerPoint slides for sure.*"

107.    Dr. Fu responded saying, "*We have been telling you that for I don't know how many times, why you think there might be some, I don't know, misinformation or misunderstanding? I don't quite get it, why you just suddenly think we won't have any slides there?*"

108.    Plaintiff responded saying, "*No, I was just going to ask how it was going to work, if we were going to need like a projector screen.*"

109.    Dr. Fu responded, "*Yeah no, we don't need—we just need—before we just have a screen there, because people are very close, they just stand there, you just have a screen and you just show the slides. It would be better to have something to look at than to just talk to them.....because we have been telling you to put up the slides, and also I sent you the slides from Caitlin, so we definitely have something there. So just update the information there.*"

110.    Dr. Fu continued saying, "*If you don't want to do any slides, then just update the information from Caitlin's slides, and yeah, we can just talk about that.*"

111.    Although that was not the case, Plaintiff felt he should just agree and walk away since he was experiencing insomnia that week due to the situation with Dr. Xia and was mentally fatigued. He did not want to risk upsetting Dr. Fu any further. He did so and left her office at 9:51 a.m.

112.    At 9:53 a.m., Dr. Xia called his personal cell phone and berated him.

113.    Dr. Xia said that he heard about what Allan told Plaintiff and then said, "*Don't listen to him, we are the boss*".

114.   Plaintiff began explaining that it just got him thinking about if he needed to reserve a projector, but Dr. Xia cut him off and said, "*You don't need to think just do it, just do it.*"

115.   Dr. Xia also said, "*Just do whatever Yusi told you to do, you don't need to argue with her.*"

116.   Plaintiff responded, "*No, no, no, no, I wasn't arguing, I just wanted to find out if I should reserve a projector or anything.*"

117.   Later in the phone call, Dr. Xia said, "*Yeah, so these weeks, probably don't mess with Yusi that much. She's under a lot of stress. So just FYI. So just for you to understand what's going on, she's doing the seminar for next week. It's a job interview, so it's, you know, like, how much stress she has. Just do whatever she told you to do. But don't bring up anything else, wait until she finishes that presentation. That will be easier.*"

118.   This phone call was extremely stressful for Plaintiff. He felt the need to clarify to Dr. Fu that he had no problem doing the presentation, he just wanted to know more about the logistics of it.

119.   After it ended, Plaintiff went back to Dr. Fu at 9:56 a.m. to try to clarify this with her.

120.   Plaintiff explained that it was not that he didn't want to do the presentation anymore, he just didn't know if they needed to rent out a projector or something to have the presentation on.

121.   Dr. Fu, did not believe him. She responded claiming, "*When I asked you, if you [got] your slides ready, you said you thought we didn't need the slides. That's what you said. It's like you were just planning to.....because we have been doing this over and over again. I don't even know how long ago, like two weeks or three weeks ago, we told you we need to have a presentation. You need to have a three to five minutes presentation to them. And somehow you just think if other cores [aren't] doing this, then we definitely aren't doing this. But we are doing this. You got the slides from last year. So with that, I just don't know why you just think we are not going to do this anymore somehow. It just doesn't make any sense, right?*"

122.   Plaintiff responded, "*I didn't think that*".

123.   Dr. Fu then claimed, "*You told me you don't think you need to prepare for the slides anymore. That's what you said.*"

124.   Plaintiff responded saying, "*I think there was a misunderstanding here.*"

125.   Dr. Fu then said if Plaintiff just wanted to know if a projector was needed, then no. She then proceeded to explain why giving a presentation was important for their core facility.

126.   Later she said, "*I'm not trying to scare you or something. It made me sad. We have been over this again and again. And suddenly all because, 'someone else told me they are not doing this, so I don't think we should do this.' Hey it also made me sad. It's like you believe in someone else instead of your own boss.*"

127.   Plaintiff responded saying, "*Dr. Fu, I feel like you've been an amazing mentor to me. I love working with you.*"

128.   Dr. Fu's response to this was disturbing to Plaintiff. In a childish, high-pitched tone of voice, she mocked Plaintiff saying, "*Yeah. It's just. You said, 'ummmmmm, Allan saaaaaid we're not doing this theeeeen I think we are not doing this ughugh'*". While mocking him, she was tilting her head side to side.

129.   Dr. Fu did not end up believing that Plaintiff was only trying to get clarification about the event.

130.   Dr. Fu and Dr. Xia's hostility was completely unwarranted and made Plaintiff feel even more stressed and afraid about coming to work.

### *March 14, 2023*

131.   Dr. Xia made offensive statements regarding people with brown skin color while speaking to Plaintiff about the concept of certain individuals being privileged in academia. These statements, captured by tape recorder were:

    A. "People these days don't like Asians and they don't like White people, they like brown people because of diversity".

    B. While talking about someone he said is Mexican, he stated, "They just looked brown and then got a lot of fellowships".

132.   These comments demonstrate that Dr. Xia holds resentment and frustration towards people with Plaintiff's skin color.

### *March 16, 2023*

133.   Dr. Xia accused Plaintiff of not doing something he thought he was required to do.  He interrogated Plaintiff intensely about this and even warned that Dr. Fu would yell at Plaintiff about it.

134.   After Dr. Xia realized he was mistaken, he did not apologize to Plaintiff.

### *April 17, 2023*

135.   Dr. Xia's hostile confrontation with Plaintiff described in this Complaint's ***Hostile Confrontation Regarding Overtime*** section.

### *Retaliation by Dr. Fu*

136.   On April 17, 2023, Plaintiff submitted the report regarding unpaid overtime to HR and notified Dr. Fu of this on the same day, at the instruction of HR.

137.   In retaliation for reporting unpaid overtime, Dr. Xia and Dr. Fu made false accusations about Plaintiff to HR and the Biomedical Sciences administration respectively on April 19, 2023. These statements were in reference to the incident on April 17, 2023 (Plaintiff became aware of these complaints after the case file of the Office of Title IX and Civil Rights Compliance (T9-CRC) investigation of Dr. Xia was shared with him on September 27, 2023).

138.   In her formal complaint submitted to Mr. Jerrod Lawerence, an administrator of the Biomedical Sciences Department, Dr. Fu claimed that Plaintiff:

    A. Accused her of breaking the law;

    B. Threatened her;

    C. Made her feel, terrified, shocked, intimidated, unsafe, deeply distressed, and extremely frightened;

    D. Had a sudden change in mood that made her feel that he was unpredictable and his behavior warranted immediate attention from HR;

    E. Had a negative impact on her emotional well-being and sense of safety in the workplace, to the point where she was having difficulty sleeping and was experiencing nightmares;

       i. In regard to Dr. Fu's formal complaint, it was stated in the T9-CRC Case Report that Dr. Fu's "*description of the incident is wholly inconsistent with the conversation captured on Complainant's recording submitted as part of his response to the case file*".

139.   On May 1, 2023, Plaintiff submitted a formal complaint to HR regarding the harassment he was facing from Dr. Xia.

140.   On May 3, 2023, during a 2 p.m. meeting that included Ms. Wafer, Mr. Lawerence, and Plaintiff, Dr. Fu notified Plaintiff of different terms and conditions of employment he was being subjected to. These included:

    A. Rescinding Plaintiff's ability to work remotely.

B. Enhanced supervision where Plaintiff had to begin submitting daily work summaries at the end of each day that listed everything he did throughout the day, by the hour.

    i. Plaintiff's co-worker at the time, Ms. Na Zhong, was not required to do this.

C. Enhanced supervision where Plaintiff had to begin scanning his ID card on the card reader of the IGBC lab door whenever he arrived at work and whenever he left so that his work hours would be tracked.

    i. Dr. Fu originally warned him that if he ever clocked in more than 40 hours during a given week, without approval for overtime, he would be terminated. Ms. Wafer said he should get a warning first instead of immediate termination.

    ii. Plaintiff's co-worker at the time, Ms. Na Zhong, was not required to do this.

141. In retaliation for reporting unpaid overtime, Dr. Fu cc'd the CFO and director of Plaintiff's department on May 4, 2023, and made negative false statements about Plaintiff's work ethic in an email thread regarding the new terms and conditions of Plaintiff's employment.

142. On May 19, 2023, Dr. Xia received notification that Plaintiff accused him of discriminatory behavior and that he was being investigated by T9-CRC.

143. In retaliation for Plaintiff's complaints, Dr. Fu informed Plaintiff on May 23, 2023, through email, that he will no longer be listed as first author on a cancer research project he was working on and assisting her with as a member of Fu/Xia lab ("Endometrial Cancer Project"). Dr. Fu originally told him he would be first author for this project on January 19, 2023. On May 23, 2023, Dr. Fu claimed she completed this herself. Plaintiff reported this to HR on May 23, 2023 and to T9-CRC on May 24, 2023.

144. In retaliation for Plaintiff's complaints, Dr. Fu informed Plaintiff on June 5, 2023, through email, that Plaintiff will no longer be listed as an author at all for the Endometrial Cancer Project, despite all of the work he had performed. This is a major setback for Plaintiff's career. Plaintiff reported this to HR, T9-CRC, and the Research Compliance Office (RCO) on June 6, 2023.

145. In retaliation for Plaintiff's complaints, Dr. Fu told Plaintiff on June 5, 2023, through email, that he can no longer work on her lab's projects (Fu/Xia lab)

unless she submits a data analysis service request to the IGBC. In other words, Plaintiff could no longer be a member of Fu/Xia lab. Plaintiff forwarded this email thread to T9-CRC and HR on June 6, 2023.

146.   Before Dr. Fu made this decision, the vast majority of Plaintiff's work involved carrying out data analysis for Fu/Xia lab projects as a member of their lab. Since the only data analysis projects he can work on now is through the IGBC, he now works on significantly less data analysis projects. There have been long periods of time where he does not work a single one of these projects, the longest period of time being 4 months. This has been incredibly damaging to Plaintiff's career as a Bioinformatician.

147.   There are 4 Fu/Xia lab projects Plaintiff either could no longer work on or could not begin working on:

    A. Endometrial cancer project

    B. c.elegan-mouse project

    C. R package project

    D. Arsenic-AQP project

148.   Another project Dr. Fu deprived him of out of retaliation was an IGBC data analysis service request from Dr. David He's lab referred to here as the "Hearing Loss Project". Plaintiff began working on this project around March 21, 2023, but on March 29, 2023, Dr. Fu told him to pause his work on it in order to focus on their Endometrial Cancer Project. After asking Dr. Fu four times on May 23, 2023, about resuming work on that project, she finally claimed she completed it herself.

149.   In retaliation for Plaintiff's complaints, on June 5, 2023 at 4:57 p.m., Dr. Fu excluded Plaintiff from the revision process for the "c.elegan Aging Atlas" paper they submitted to a top journal for publication. This was a collaboration between Plaintiff, Dr. Fu, and her colleagues at Baylor College of Medicine (BCM), the institution where she completed her post-doc. This was damaging to his career because none of his original contributions were included in the final publication, which has a negative impact on his portfolio, something that is very important for career advancement in the field of Bioinformatics. Also, his name ended up being moved from 4th author to 8th in the final publication, diminishing the original role he played in this project.

150.   Dr. Fu originally made statements that indicated she planned on getting his name removed from the c.elegan Aging Atlas paper. At 8:00 AM on 5/30/23, Dr.

Fu sent Plaintiff an email warning him that he could possibly have his name removed as an author from this paper, she said, "*Also, just a reminder, the revision part of a paper is an important part of the publication process, failure to fulfill this part can lead to removal from the author list as the work needed to be done during the revision can be more important than the work when the paper is submitted. This is a fact; I'm just trying to iterate this to avoid any future dispute. And let me know if you don't want to work on the revision.*"

151.    Plaintiff asked her for clarification and she told him that if he is "actively" part of the revision process, he won't have his name removed. Plaintiff was required to prioritize data analysis service requests from users of the IGBC and Dr. Fu took advantage of this when he had to pause working on the Endometrial Cancer Project in order to fulfill service requests. He became very concerned the Dr. Fu planned to take advantage of this again. He asked her for more clarification, and she told him this decision would be up to the corresponding author, Dr. Meng Wang. Dr. Wang was Dr. Fu's PI while she worked on her post doc at BCM. Plaintiff never had any communication with Dr. Wang or the other authors up to this point.

152.    Plaintiff emailed Dr. Wang asked her what the expectations were for him during the revision process to remain as an author on this paper. Dr. Wang ended up deciding that Plaintiff's name should be kept on the paper, however, Dr. Fu told him he could no longer be part of the revision process. Plaintiff reached out to Dr. Wang about this, but she told him that is up to Dr. Fu since she was the one in charge of assigning tasks and coordinating work for the project.

153.    On May 30, 2023, at 1:00 p.m., Plaintiff made HR aware of Dr. Fu's warning that it was possible for his name to be removed from the c.elegan Aging Atlas paper. Ms. Wafer had a meeting with him on May 31, 2023 where she questioned him about why he reached out to Dr. Wang and told him not to contact her again. On June 5, 2023, Plaintiff reported Dr. Fu's warning about authorship removal to T9-CRC. He also reported that to RCO on June 6, 2023. On June 27, 2023, Plaintiff reported Dr. Fu's decision to exclude him from the revision process to T9-CRC. HR and RCO was made aware of that on June 29, 2023.

154.    On June 22, 2023, Dr. Fu instructed Plaintiff to stop emailing her the daily work summaries that included what he did by the hour at the end of each day (which she had him begin on May 3, 2023) and instead send a different work summary using a form she created. She referred to this as the "project summary"

20

template. Her reason was that the hourly work summaries were unnecessary, stating, "*We don't need a very tight time of what you are doing.*" However, after Plaintiff began a temporary disability accommodation on June 28, 2023 to work remotely, she told him to resume sending the hourly work summary along with the new project summary. Plaintiff was then required to send two types of work summaries at the end of each day.

155.   This was very stressful for Plaintiff during his disability accommodation because it was tedious to do programming related work, he was already experiencing difficulty with focusing and getting work done due to the negative impact the her and Dr. Xia's actions towards him had on his mental health, and he was worried that she had plans to find a way to use his work summaries as reason to terminate him. On June 28, 2023, Plaintiff reported this to HR. On July 13, 2023, he reported it to T9-CRC and to HR for a second time. After that disability accommodation ended on August 11, 2023, Plaintiff emailed Dr. Fu and asked if he still needed to send both summaries at the end of each day or only the project summary. She did not respond to him.

156.   On August 14, 2023, Plaintiff was told by Dr. Fu that he would no longer receive wet-lab training for something called Next-Generation Sequencing (NGS) library preparation, which involves applying laboratory procedures to prepare biological samples for genetic sequencing. This would have been a very valuable skill for Plaintiff to have and was a significant setback for his career.

157.   Plaintiff is 2 years into his career but has a lot less experience with NGS data analysis to display on his portfolio compared to other bioinformaticians with similar years of experience. He also never gained any hand-on experience with NGS library preparation.

### ***Retaliation by Dr. Xia***

158.   In retaliation for Plaintiff reporting unpaid overtime, Dr. Xia reported false accusations about him to HR on April 19, 2023. His accusations were in reference to the incident that occurred on April 17, 2023 (Plaintiff became aware of this from the case file of T9-CRC).

159.   In Dr. Xia's formal complaint submitted to HR, he claimed that Plaintiff:

A. Was confrontational;

B. Repeatedly shouted, "It is the federal law, it is the federal law";

C. Appeared increasingly unstable;

D. Intimidated him;

E. Made him feel unsafe;

    i.  In regard to Dr. Xia's formal complaint, it was stated in the T9-CRC Case Report that Dr. Xia's "description is inconsistent with the recording".

    ii.  The T9-CRC outcome letter also stated, "*Dr. Xia's portrayal of Mr. Mohammed as the aggressor is inconsistent with the recording*", and "*it is inappropriate and unprofessional to characterize Mr. Mohammed as being threatening or unstable in the interaction based on the recording that was available*".

160.   In retaliation for Plaintiff's complaints, Dr. Xia turned someone away from utilizing the IGBC's data analysis service, the service Plaintiff was responsible for fulfilling.

161.   On July 5, 2023, Ms. Renju Pun, a user of the IGBC's services, informed Plaintiff that after she expressed interest in submitting a request for data analysis service during a conversation with Dr. Xia, he told her to do the analysis herself.

162.   He said this to her on or about June 30, 2023.

163.   Plaintiff is responsible for carrying out data analysis service requests for the core facility. Dr. Xia turned Ms. Pun away from utilizing the core facility to prevent Plaintiff from gaining more data analysis experience.

164.   During the recorded meeting between Plaintiff and Ms. Pun on July 5, 2023, she told Plaintiff that Dr. Xia told her to do the analysis herself, which was out of tradition for the roles and responsibilities of Plaintiff and herself.

165.   Ms. Pun said she considered emailing Dr. Fu about this but refrained from doing so because whenever she had done so in the past, Dr. Xia ended up being the one who responded to her. She then said a second time during that conversation that she did not want to "cross" Dr. Xia.

166.   During the conversation, Ms. Pun also mentioned that Dr. Brian North, her PI, kept asking her why the IGBC was not handling the analysis and asked her, "Can't Aaron do it?" Ms. Pun then asked Plaintiff, "how do I even tell him that there's this awkward answer that was given to me where I don't really antagonize another PI?"

167.   On July 13, 2023, Plaintiff reported this to HR and T9-CRC.

### ***Misrepresentation of Student Loan Forgiveness***

168.   During salary negotiation for this job, Dr. Xia misled Plaintiff into believing that if he accepted this job, he would help Plaintiff pay off his student loan debt by serving as his mentor for a National Institutes of Health loan repayment program called LRP-REACH.

169.   When Plaintiff looked at the requirements for this program, it appeared that he did not qualify for it since he did not have a PhD or other type of terminal degree. After expressing concerns about his eligibility, Dr. Xia reassured Plaintiff that he qualified.

170.   On January 31, 2023, after expressing concerns about eligibility for this program to Dr. Fu, Dr. Xia again reassured Plaintiff that he qualified for this program and then asked him for a favor which involved working overtime. He told Plaintiff that by helping him with this favor, it would enhance Plaintiff's application and increase his chances of being selected to have his student loan debt paid off.

171.   During February, 2023, while helping him with that favor, he repeated this to Plaintiff 2 more times. After Plaintiff completed the overtime work that was requested, Dr. Xia told him that it was "extremely unlikely" to be selected without having a PhD, so it would be a waste of time applying to it.

172.   Plaintiff realized that he was lied to and never actually qualified for this program. This caused Plaintiff a great deal of stress and anxiety.

### *Aftermath*

173.   On August 23, 2023, Plaintiff was informed that Dr. Fu would no longer be his supervisor. Plaintiff had his first meeting on August 28, 2023, with his new supervisor, Dr. James Grunkemyer.

174.   Plaintiff was told that Dr. Fu was still expected to provide Plaintiff with guidance for his work through email since Dr. Grunkemyer did not have a background in Plaintiff's type of work.

175.   After pointing out to Dr. Grunkmeyer that Dr. Fu was not being helpful to Plaintiff, he spoke with her about it on two occasions before she made the decision to stop guiding Plaintiff. On November 9, 2023, Dr. James Grunkemyer informed Plaintiff that Dr. Fu will no longer be providing Plaintiff with guidance for his work and later told him this decision was her own.

176.   It was very important to have someone with expertise like Dr. Fu provide guidance and training for Plaintiff because he is still early in his career.

177.   Despite reporting many instances of retaliation to HR and T9-CRC, they never officially acknowledged any of the adverse actions Plaintiff endured after reporting.

178.   On May 11, 2024, Dr. Fu was promoted to the position of Assistant Professor, a tenure track position.

179.   At the beginning of June 2024, she left Creighton University. At the beginning of November 2024, Dr. Xia also left the institution.

180.   December 2024, Plaintiff was terminated from Creighton University. They offered Plaintiff approximately $6,000.00 severance if he signed an agreement that would have prevented him from filing this Complaint.

181.   Plaintiff experienced ongoing discrimination based on a specific protected characteristic of his race and ethnicity. This included, but was not limited to:

    A. Dr. Xia's harassment towards him, which was not directed towards White or East Asian individuals, and included offensive comments regarding people of his skin color;

    B. Being subjected to new terms and conditions of employment that his East Asian co-worker was not:

        i. Enhanced supervision where Plaintiff had to begin submitting daily work summaries at the end of each day that listed everything he did throughout the day, by the hour.

        ii. Enhanced supervision where Plaintiff had to begin scanning his ID card on the card reader of the IGBC lab door whenever he arrived at work and whenever he left so that his work hours would be tracked.

182.   Following the Plaintiff's complaints about the unpaid overtime and discriminatory treatment, his supervisor, Dr. Fu, engaged in retaliatory actions which further exacerbated the hostile work environment. They included but were not limited to:

    A. (April 19, 2023) False accusations that he:

        i. Was threatening;

        ii. Made her feel, terrified, shocked, intimidated, unsafe, deeply distressed, and extremely frightened;

        iii. Made her feel that he was unpredictable and his behavior warranted immediate attention from HR;

iv. Had a negative impact her emotional well-being and sense of safety in the workplace.

B. (May 3, 2023) Rescinding his ability to work remotely;

C. (May 3, 2023) Enhanced supervision where Plaintiff had to begin submitting daily work summaries at the end of each day that listed everything he did throughout the day, by the hour;

D. (May 3, 2023) Enhanced supervision where Plaintiff had to begin scanning his ID card on the card reader of the IGBC lab door whenever he arrived at work and whenever he left so that his work hours would be tracked;

E. (May 4, 2023) CC'ing the CFO and director of his department in an email thread and then making negative false statements regarding his work ethic;

F. (May 23, 2023) Telling him that he would no longer be first author on the Endometrial Cancer Project, a project she assigned to him and originally told him he would be first author;

G. (May 23, 2023) Completing the Hearing Loss Project, a project she told him to pause his work on and was one of the data analysis service projects he was originally supposed to fulfil, depriving him of more data analysis experience;

H. (May 30, 2023)  Warned him he could potentially have his name removed from the c.elegan Aging Atlas paper depending on how "active" he was in the revision process. This made him immensely stressed and anxious;

I. (June 5, 2023) Telling him that he would no longer be listed as an author on the Endometrial Cancer Project;

J. (June 5, 2023) Telling him he could no longer work on Fu/Xia lab projects unless she submits a data analysis service request to the IGBC, removing him as a member of Fu/Xia lab, which resulted in a dramatic reduction in the amount of work for him. Because of this, there were 4 Fu/Xia lab projects Plaintiff either could no longer work on or could not begin working on:

i. Endometrial cancer project

ii. c.elegan-mouse project

iii. R package project

       iv.   Arsenic-AQP project

K. (June 5, 2023) After the individual with authority over authorship for the c.elegan Aging Atlas paper decided he should keep his name on that paper regardless of how active he was in the revision process, Dr. Fu told him he was not allowed to work on it. Because of this:

       i.   None of his original contributions were included in the final publication, which has a negative impact on his professional portfolio.

       ii.  His name ended up being moved from 4th author to 8th in the final publication, diminishing the original role he played in this project.

L. (June 22, 2023) After he began a temporary disability accommodation to work remotely, she made him begin sending two forms of daily work summaries at the end of each day, despite previously telling him that the hourly daily work summary was unnecessary.

M. (August 14, 2023) Telling him that he would no longer receive wet-lab training for NGS library preparation, which would have been a very valuable skill for Plaintiff to have and was a significant setback for his career.

N. (November 9, 2023) Decided to no longer provide data analysis guidance/training to him.

183.   Following the Plaintiff's complaints about the unpaid overtime and discriminatory treatment, his supervisor's husband, Dr. Xia, engaged in retaliatory actions which further exacerbated the hostile work environment. They included but were not limited to:

A. False accusations that Plaintiff:

       i.   Was confrontational;

       ii.  Repeatedly shouted, "It is the federal law, it is the federal law";

       iii. Appeared increasingly unstable;

       iv.  Intimidated him;

       v.   Made him feel unsafe;

B. Attempted to deprive him of more data analysis experience by turning Ms. Pun away from submitting a data analysis service request to the IGBC, despite being a co-director of the IGBC.

184.   Due to the discriminatory and retaliatory actions, the Plaintiff was deprived of valuable experience in the highly technical field. This loss has hindered the Plaintiff's career progression and opportunities for advancement, causing long-term professional harm.

185.   The hostile work environment and retaliatory actions have caused the Plaintiff significant emotional distress. The Plaintiff has suffered from suicidal ideation, panic attacks, rumination, nightmares, major difficulty resisting the urge to pace back and forth. This distress has exacerbated his ADHD symptoms, making it extremely difficult for him to get work done or complete important tasks, adversely affecting both his professional and personal life.

186.   The Plaintiff seeks relief for the damages incurred as a result of the Defendants' discriminatory and retaliatory actions. This includes compensation for lost wages, wrongful termination, emotional distress, and any other appropriate remedies as determined by the Court.

## CAUSES OF ACTION

### COUNT I
### Racial Discrimination Under the Nebraska Fair Employment Act
#### (Against all Defendants)

187.   Plaintiff refers to and incorporates by reference each and every allegation of Paragraphs 1 through 185 above as fully set forth herein.

188.   Defendants actions constitute violations of the Nebraska Fair Employment Practices Act, Neb. Rev. Stat. §§ 48-1101 to 48-1125 ("FEPA").

189.   Plaintiff is a member of a protected class, and was qualified for the position he was in.

190.   Plaintiff suffered adverse employment actions on the basis of his racial group and skin color that is protected under FEPA. This includes but is not limited to termination, harassment, bullying, discrimination, and hampering Plaintiff's career.

191.   Similar employees outside of Plaintiff's protected class were treated more favorably that suggest a discriminatory motive by Defendants.

192.   These repeated instances of discrimination constitute unlawful discrimination under Neb. Rev. Stat. §§ 48-1101 et. seq., and as direct and proximate result of the Defendants' violations of FEPA, Plaintiff has suffered and is still suffering

damages including, without limitation, actual and consequential damages for economic loss.

193. As the direct and proximate result of Defendant's violations of FEPA, Plaintiff has suffered substantial non-economic damages, including and without limitation, emotional and physical suffering and distress, humiliation, and intangible injury for the deprivation of his rights.

**COUNT II**

**Retaliation Under the Nebraska Fair Employment Act**

**(Against all Defendants)**

194. Plaintiff refers to and incorporates by reference each and every allegation of Paragraphs 1 through 185 above as fully set forth herein.

195. Plaintiff engaged in protected conduct when they complained about race-based discrimination.

196. Defendants subjected Plaintiff to adverse employment actions after Plaintiff engaged in protected conduct, including termination and a change in how they could perform their duties when compared to similarly situated employees.

197. There was a causal connection between the protected conduct and the adverse action.

198. As a direct and proximate result of these actions, Plaintiff has suffered financial and physical well-being damages.

199. After reporting instances of discrimination, Plaintiff has been fired by Creighton University, directly demonstrating retaliation.

200. Defendants, therefore, are liable for the damages caused approximately resulting from its retaliation.

**COUNT III**

**42 U.S.C. § 1981 Retaliation**

**(Against all Defendants)**

201. Plaintiff refers to and incorporates by reference each and every allegation of Paragraphs 1 through 185 above as fully set forth herein.

202. Plaintiff engaged in protected conduct when they complained about race-based discrimination.

203. Defendants subjected Plaintiff to adverse employment actions after Plaintiff engaged in protected conduct, including termination and a change in how they could perform their duties when compared to similarly situated employees. Defendants also made false reports about Plaintiff.

204.    There was a causal connection between the protected conduct and the adverse action.

205.    As a direct and proximate result of these actions, Plaintiff has suffered financial and physical well-being damages.

206.    After reporting instances of discrimination, Plaintiff has been fired by Creighton University, directly demonstrating retaliation.

207.    Defendants, therefore, are liable for the damages caused approximately resulting from its retaliation.

**COUNT IV**

**42. U.S.C. § 2000(e)-2(m), et seq. ("Title VII")**

**Racial Discrimination by an Employer**

**(Against all Defendants)**

208.    Plaintiff refers to and incorporates by reference each and every allegation of Paragraphs 1 through 185 above as fully set forth herein.

209.    Defendant's actions constitute violations of Title VII of the Civil Rights Act of 1964 as amended (42 U.S.C. §2000(e)-2(m) et seq.)

210.    Plaintiff was subjected to unlawful treatment by Dr. Xia and Dr. Fu. Creighton University had knowledge of, and failed to correct, discriminatory practices committed against Plaintiff.

211.    The unlawful discriminatory practices to which Plaintiff was subjected included the acts of disparate treatment alleged above.

212.    The conduct of Creighton University was intentional and in reckless disregard to Plaintiff's rights under clearly established federal law.

213.    Defendant's actions segregated and classified the Plaintiff on the basis of his race, and as a result deprived the Plaintiff of employment opportunities. This constitutes unlawful discrimination under Title VII of the Civil Rights Act, and as direct and proximate result of Defendant's violations of Title VII, Plaintiff has suffered and is still suffering damages including, without limitation, actual and consequential damages for economic loss.

214.    As the direct and proximate result of Defendant's violations of Title VII, Plaintiff has suffered substantial non-economic damages, including and without limitation, emotional and physical suffering and distress, humiliation, and intangible injury for the deprivation of his rights. As a direct and proximate result of Defendant's

illegal and unjustified conduct, Plaintiff was injured and is entitled to recover for what he suffered in the past and will suffer in the future, including:

    A. Deprivation of constitutional and civil rights;

    B. Humiliation, degradation, public ridicule, and past and future emotional distress;

    C. Actual and compensatory damages, including but not limited to past, present and future pain and suffering, mental anguish, loss of enjoyment of life and other economic losses;

    D. All litigation expenses associated with the prosecution of the instant action, including, but not limited to, court costs, anticipated discovery expenses, anticipated expert expenses, and the maximum legally allowable judgment interest; and

    E. Any other expenses allowed by federal or state law, including but not limited to reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

**WHEREFORE** the Plaintiff pray for Judgment against Defendant as follows:

    A. Compensation for violation of constitutional and civil rights, compensatory damages for pain, suffering, mental anguish, and humiliation;

    B. Plaintiffs' cost in this action, including reasonable attorney fees, interest, and costs pursuant to 42 U.S.C. § 1988; and

    C. Such relief as the Court deems just and equitable.

**COUNT V**

**42. U.S.C. § 2000(e)-2(m), et seq. ("Title VII")**

**Race Discrimination Constituting Hostile Work Environment**

**(Against Creighton University)**

215.    Plaintiff refers to and incorporates by reference each and every allegation of Paragraphs 1 through 180 above as fully set forth herein.

216.    Plaintiff, as a member of a protected class, was subject to repeated instances of harassment that disregarded and disrespected Plaintiff's human dignity by the Defendants.

217.    The discrimination suffered by Plaintiff was illegal discrimination based on his race and skin color. The harassing conduct to which Plaintiff was subjected to was so severe, widespread, and/or persistent that a reasonable person in Plaintiff's circumstances would have considered the work environment to be hostile and/or abusive. Plaintiff considered the work environment to be hostile and/or abusive. Each Defendant failed to take prompt, remedial and effective action to stop the harassment.

218.    The main perpetrator, Dr. Xia, repeatedly demonstrated a bias and stereotyped Plaintiff on the basis of his race. These instances of discrimination were so severe and pervasive that they affected Plaintiff's health and well-being to the point that his mental health and wellbeing were severely impacted as documented by his healthcare providers.

219.    As the employer of Dr. Xia, Creighton University is also at fault for not preventing or stopping the discrimination suffered by Plaintiff. And as the supervisor of Plaintiff's program, Defendant failed to keep a nondiscriminatory environment within the department.

220.    As a direct and proximate result of Defendants' illegal and unjustified conduct, Plaintiff was injured and is entitled to recover for what he suffered in the past and will suffer in the future, including:

A.  Deprivation of constitutional and civil rights;

B.  Humiliation, degradation, public ridicule, and past and future emotional distress;

C.  Actual and compensatory damages, including but not limited to past, present and future pain and suffering, mental anguish, loss of enjoyment of life and other economic losses;

D.  All litigation expenses associated with the prosecution of the instant action, including, but not limited to, court costs, anticipated discovery expenses, anticipated expert expenses, and the maximum legally allowable judgment interest; and

E.  Any other expenses allowed by federal or state law, including but not limited to reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

**WHEREFORE** the Plaintiff pray for Judgment against Defendants as follows:

31

A.   Compensation for violation of constitutional and civil rights, compensatory damages for pain, suffering, mental anguish, and humiliation;

B.   Plaintiffs' cost in this action, including reasonable attorney fees, interest, and costs pursuant to 42 U.S.C. § 1988; and

C.   Such relief as the Court deems just and equitable.

## COUNT VI
## 42 U.S.C. § 1983
## Unconstitutional Official Policy; Failure to Investigate, Supervise and Train (Against all Defendants)

221.   Plaintiff refers to and incorporates by reference each and every allegation of Paragraphs 1 through 185 above as fully set forth herein.

222.   Defendant Creighton University, by and through its policy makers, failed to ensure through custom, policy and/or practice or training that its employees and supervisors would obey, follow, and otherwise and abide by appropriate protocol and procedures regarding discrimination in the workplace and other violations of civil rights and failed to properly investigate complaints or incidents of such unlawful conduct by its employees.

223.   Defendant Creighton University, and/or other final policy makers had actual or constructive notice of the failures of its personnel to obey, follow and/or enforce appropriate policies and/or protocols or implement effective training and supervision of faculty and employees.

224.   Such failures to investigate, train, and supervise were conducted under color of state law and such unconstitutional customs practices and/or policies amounted to gross negligence, deliberate indifference, or intentional conduct, which were the moving force behind Plaintiff's injuries.

225.   The effect of the conduct complained of herein has been to deprive Plaintiff of equal employment opportunity and has otherwise adversely affected his status as an employee because of his race.

226.   As a result of the aforesaid occurrence, Plaintiffs suffered damages and injuries. Defendants are liable for said damages and injuries to the Plaintiff and he is entitled to relief

## COUNT VII
## Intentional Infliction of Emotional Distress

**(Against all Defendants)**

227.   Plaintiff refers to and incorporates by reference each and every allegation of Paragraphs 1-185 above as fully set forth herein.

228.   As set forth in detail above Defendants, Dr. Xia and Dr. Fu, engaged in extreme and outrageous conduct. For example, in concocting and cultivating a false narrative about Plaintiff, and engaging in numerous acts of outrageous conduct the purpose of which was to control or limit Plaintiff.

229.   Defendants, Dr. Xia and Dr. Fu, caused ongoing emotional and psychological abuse

230.   Defendants' misconduct was reckless and/or with the intent of causing Plaintiff severe emotional distress.

231.   As a direct and consequential result of Defendants' misconduct, Plaintiff has suffered severe emotional distress. Such harm includes without limitation, pain, highly unpleasant mental reactions such as extreme anxiety, fright, intense grief, lengthy depression, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, stress, frustration, fear, and loss of enjoyment of life.

232.   Defendants engaged into the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiff with the conscious disregard of the rights and safety of Plaintiff; and with an improper and evil motive amounting to malice.

**COUNT VIII**
**Unintentional Infliction of Emotional Distress**
**(Against Dr. Fu)**

233.   Plaintiff incorporates by reference the allegations obtained in the foregoing paragraphs 1-185 as fully set forth herein.

234.   Defendant, Dr. Fu, as a supervisor, owed a duty of care to Plaintiff to ensure a safe and respectful work environment, free from extreme and outrageous conduct, ensuring a safe and healthy work environment, providing adequate training, and addressing any issues that could harm employees.

235.   Defendant, Dr. Xia breached this duty of care by engaging in conduct that was extreme, outrageous, and beyond the bounds of decency including but not limited to:

   A. Defendant's specific words regarding people with brown skin;

   B. Defendant physically touching Plaintiff without his permission;

   C. Defendant berating Plaintiff on numerous occasions;

    D. Defendant continually engaging in conduct and actions that have caused Plaintiff great distress and confusion.

236.   Defendant's conduct was intentional and/or reckless, with the knowledge that such actions would likely cause severe emotional distress to Plaintiff.

237.   As a direct and proximate result of Defendant's extreme and outrageous conduct, Plaintiff has suffered severe emotional distress, including but not limited to anxiety, depression, suicidal ideation, loss of enjoyment of life, humiliation, rumination, nightmares, and excessive pacing.

238.   These have resulted in physical symptoms of insomnia, fatigue, back pain, and hair loss.

239.   Plaintiff has incurred damages as a result of the severe emotional distress caused by Defendant's conduct, including but not limited to:

    A. Medical expenses for therapy and treatment

    B. Lost wages due to the inability to work

## COUNT IX
## Defamation/Libel and Slander
### (Against Dr. Fu and Dr. Xia)

240.   Plaintiff incorporates by reference the allegations obtained in the foregoing paragraphs 1-185 as fully set forth herein.

241.   Defendants, Dr. Xia and Dr. Fu, made false, misleading, vile, and unsubstantiated accusations to third parties outside of a privileged relationship, including, but not limited to those false statements set forth above.

242.   Defendants false, misleading, vile, and unsubstantiated accusations that amount to defamatory statements that were made with negligent, reckless and/or intentional disregard for the truth and the harm which they have caused, are causing and will continue to cause Plaintiff.

243.   Defendant's statements amount to defamation, including defamation per se and that they impute that Plaintiff was not fit for their position. These statements both spoken to third parties and written and published, were made with actual malice, and such accusations are vile, they have damaged Plaintiff's reputation and will result in public shame and scorn upon Plaintiff and has already.

244.   Such statements harm Plaintiff's business interests and his profession.

245.   Plaintiff has been damaged by Defendants' statements and has incurred special damages as a result.

34

**PRAYER FOR RELIEF**

*WHEREFORE*, Plaintiff prays this Court will grant the following in favor of them:

A. Judgment for all actual and compensatory damages, including those emanating from mental anguish and emotional distress, pecuniary loss, loss of reputation, and other economic damages;

B. Judgment as damages from and declarations of, violations of their constitutional and civil rights committed by Defendants.

C. Punitive damages to the extent permitted by law;

D. Equitable damages to the extent permitted by law;

E. An award of attorneys' fees and costs, including expert witness fees, pursuant to 42 U.S.C. § 1988, and any other applicable provisions of law.

**AARON S. MOHAMMED, Plaintiff**

*Respectfully submitted,*

BY:     /s/ *John D. Cartier* /s/

John D. Cartier #26307

Cartier Law, LLC

PO Box 5241

Lincoln, Nebraska 68505

(954) 319-9832

johncartierlaw@gmail.com

35