IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| AARON S. MOHAMMED,<br><br>Plaintiff,<br><br>vs.<br><br>CREIGHTON UNIVERSITY, DR. JUN XIA,<br>and DR. YUSI FU,<br><br>Defendants. | **8:24CV472**<br><br>**MEMORANDUM AND ORDER** |

Plaintiff, who describes himself as "an Indo-Caribbean-American man," asserts nine causes of action under Title VII of the Civil Rights Act of 1964, the Nebraska Fair Employment Practice Act (NFEPA), 42 U.S.C. §§ 1981 and 1983, and Nebraska common law arising from his employment with and subsequent termination from a position at a private university. Filing No. 1. The Defendants in this case are the university and the co-directors of the university facility where Plaintiff worked. This case is before the Court on Defendants' Motion to Dismiss all nine of Plaintiff's causes of action for failure to state claims upon which relief can be granted. Filing No. 16. For the reasons stated below, Defendants' Motion is granted as to Plaintiff's federal claims and state statutory claims, while the Court declines to exercise supplemental jurisdiction over Plaintiff's state common-law claims, and those claims are dismissed without prejudice.

## I.     INTRODUCTION

### A.  Factual Background

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court draws the factual background to the case from the Complaint and accepts nonconclusory allegations as true. *See Bauer v. AGA*

*Serv. Co.*, 25 F.4th 587, 589 (8th Cir. 2022) (citing *Pietoso, Inc. v. Republic Servs., Inc.*, 4 F.4th 620, 622 (8th Cir. 2021)).  Thus, the factual background here is drawn from Plaintiff's Complaint.  Filing No. 1.  The Court will set out in somewhat more detail any additional factual allegations that appear to be pertinent to Plaintiff's claims when the Court considers those claims in turn in the legal analysis below in § II.

### 1.    The Parties

Plaintiff Aaron Mohammed is "an Indo-Caribbean-American man" who was at all times pertinent to his Complaint an "employee" of Defendant Creighton University within the meaning of Title VII and NFEPA.  Filing No. 1 at 1 (¶ 5).  Creighton University (the University) is a Nebraska nonprofit corporation.  *Id.* at 2 (¶ 6).  Mohammed was hired on or about August 16, 2022, by Defendant Dr. Yusi Fu, who was then a Research Assistant Professor and the Director of the Innovative Genomics and Bioinformatics Core (IGBC) at the Lynch Cancer Research Center at the University.  *Id.* (¶ 9).  Fu explained to Mohammed "that his role would primarily be that of a Bioinformatician who manages IGBC, fulfills data analysis services requested by IGBC users, and carries out data analysis for . . . lab projects."  *Id.* (¶ 10).  Mohammed began work at the University on October 3, 2022, with Fu as his supervisor.  *Id.* (¶ 11).  Defendant Dr. Jun Xia, who is Fu's husband, was at all relevant times an Assistant Professor at the University and on February 28, 2023, he became a Co-Director of the IGBC with Fu.  *Id.* (¶¶ 8, 12).  However, Fu remained Mohammed's sole supervisor after Xia became a Co-Director of IGBC.  *Id.* (¶ 12).

### 2. The Central Allegation Offered to Show Motive

Central to Mohammed's claims is his "belie[f]" that he suffered discrimination and harassment "due to the color of his skin based on derogatory comments [Xia] made to [Mohammed] regarding people with brown skin color." Filing No. 1 at 5 (¶ 46). Mohammed alleges,

> 47. On March 14, 2023, around 12:15 p.m. and while they were alone together, Dr. Xia began talking about the concept of certain individuals being privileged in academia and then told Plaintiff, "People these days, they don't like Asians and they don't like White people, they like brown people because it's diversity."
>
> 48. Shortly after, while Dr. Xia was speaking about another individual, who according to him is Mexican, he said, "They just looked brown and then got a lot of fellowships."

Filing No. 1 at 5 (¶¶ 47–46); *see also id.* at 16 (¶¶ 131–32) (repeating these comments and asserting that they "demonstrate that Dr. Xia holds resentment and frustration towards people with Plaintiff's skin color."). The Complaint contains no other nonconclusory factual allegations that support Mohammed's "belie[f]" that he suffered any negative treatment because of his race or skin color. Filing No. 1 *passim*.

### 3. The Alleged Ill Treatment

Mohammed's Complaint contains numerous allegations of negative treatment. Rather than set out all those allegations in detail here, the Court will attempt to categorize and summarize them.

#### a. Xia's "Traps" to Criticize Mohammed

Mohammed alleges that Xia set "traps" to give Xia the opportunity to criticize him. Filing No. 1 at 6–10. Mohammed alleges that in the first such instance, Xia gave him certain information about accounts to use for billing in November 2022 and January 2023,

then criticized Mohammed for following that information and accused him of forgetting things in a way that Mohammed believed showed Xia enjoyed criticizing him. *Id.* at 6–8 (¶¶ 53–63). The second example of Xia "setting a trap" to criticize Mohammed occurred between February 27 and March 2, 2023, while he was working from home and Fu and Xia were away on vacation. *Id.* at 8 (¶ 65). Mohammed alleges that this incident involved Xia "invit[ing] Plaintiff to ask questions regarding the ownership of certain sequencing samples and then berat[ing] him for doing so," in response to which Mohammed alleges that he "stood up for himself by asking Dr. Xia to explain what he did wrong." *Id.* (¶ 64); *see also id.* at 8–10 (¶¶ 66–83) (describing the incident in detail). The majority of the communications occurred on March 1, 2023. *Id.* (¶¶ 67–79). Mohammed alleges that he did not answer various calls from Xia and instead responded with texts and emails because "it was more appropriate to continue correspondence through email so that there could be a record of what Dr. Xia was communicating to Plaintiff." *Id.* at 9 (¶ 75).

Mohammed alleges that he was so upset by this incident that on March 3, 2023, he took his first sick day since starting his job. Filing No. 1 at 10 (¶¶ 81–82). After the incidents on and around March 1, 2023, Mohammed alleges that he also made his first complaint to HR:

> 88.    On March 6, 2023, at 10:20 a.m., Plaintiff sent [an] email to HR expressing some of his concerns about Dr. Xia and requested a meeting. He later sent another email requesting confidentiality and stated that he would not like anyone outside of HR to hear about this.

Filing No. 1 at 11 (¶ 88). Mohammed also alleges that he "began keeping recording devices on him while at work on March 6, 2023, due to Dr. Xia's harassment of him." *Id.* at 2 (¶ 13).

Mohammed alleges that following the March 1, 2023, incidents, Xia made "threatening comments" to Mohammed that "had a major negative impact on [Mohammed's] mental health," and Xia "massaged" Mohammed while he made those threats.  Filing No. 1 at 10–11 (¶¶ 84, 90).  These threats and the "massage" occurred during Mohammed's first in-person meeting with Xia after the incidents on and around March 1, 2023, and involved Xia telling Mohammed that he had been "pissed" at him, while "massaging" Mohammed's shoulder, which made Mohammed uncomfortable, and stating that he was "only warning" Mohammed about what would happen if Mohammed made professors "pissed."  Id. at 11–12 (¶¶ 92–96).  Mohammed alleges that Xia's level of anger was "overblown and unjustified" but that "Dr. Xia's bullying of [Mohammed] was unfortunately the norm."  Id. at 12–13 (¶¶ 97–100).

### b.    The Overtime Confrontation

Mohammed alleges what he describes as a "Hostile Confrontation Regarding Overtime."  Filing No. 1 at 2; *see also* id. at 16–17 (referring again to the "Hostile Confrontation Regarding Overtime" on April 17, 2023).  Mohammed alleges that although he asked Fu on October 3, 2022, if he would get paid for overtime, she told him no, that he should enter 8 hours for each day of work regardless of the amount of time he actually worked, and that she would give him extra time off for overtime hours worked.  Id. at 2 (¶¶ 14–15).  Mohammed learned on March 10, 2023, from a meeting with a Human Resources (HR) officer that he was supposed to receive overtime pay.  Id. (¶ 16).  Eventually, on April 17, 2023, Mohammed informed Fu that he was aware that he was owed overtime pay and that he had sent documentation to HR to show how much overtime he had worked.  Id. at 3 (¶¶ 22–23).  Minutes later, Mohammed had a "hostile

confrontation" with Xia about why he had sent overtime documents to HR, which allegedly involved Xia raising his voice and Mohammed feeling "in danger of being physically assaulted." *Id.* at 3–4 (¶¶ 24–30). Xia allegedly told Mohammed that Fu telling him he did not get overtime was "a misunderstanding or miscommunication," which Mohammed denies. *Id.* at 4 (¶¶ 32–33).

### c. Other Incidents

Mohammed alleges other instances of ill treatment in early 2023. He alleges that on March 10, 2023, "[t]here was hostility from both Dr. Fu and Dr. Xia after Plaintiff attempted to get clarification about an upcoming event from Dr. Fu." Filing No. 1 at 13 (¶ 101). This incident began as follows:

> 102. Plaintiff was tasked with making a PowerPoint presentation for "Core Fest", an event aimed to increase awareness and usage of the core facilities at Creighton, which would involve people having the opportunity to take tours of each facility. Dr. Fu told him that he would be presenting this PowerPoint at the event. Plaintiff assumed that he and all the other core managers would each be giving presentations about the services their cores offer to an audience on a projector screen.

Filing No. 1 at 13 (¶ 102). However, on March 8, 2023, Mohammed learned from the manager of another "core" that his understanding was mistaken. *Id.* (¶ 103). Mohammed attempted to clarify the matter when Fu asked if he had finished the slides. *Id.* at 14 (¶ 104). Mohammed "sensed that Dr. Fu was getting upset with him," so after an exchange—which he sets out at length—he simply agreed with Fu and left her office. *Id.* (¶¶ 104–11). Mohammed alleges that minutes later, Xia called his personal cell phone "and berated him," which Mohammed found "extremely stressful." *Id.* at 14–15 (¶¶ 112–18). When Mohammed had a further discussion with Fu to clarify that he was willing to do the presentation, she disputed his statements, criticized him, and "mocked" him "[i]n a

childish, high-pitched tone of voice." *Id.* at 15–16 (¶¶ 119–20). Mohammed alleges, "Dr.

Fu and Dr. Xia's hostility was completely unwarranted and made Plaintiff feel even more

stressed and afraid about coming to work." *Id.* at 16 (¶ 130).

Mohammed reiterates his allegations about Xia's comments about "brown" people

with a specification that the comments were made (and he recorded them) on March 14,

2023. Filing No. 1 at 16 (¶¶ 131–32). Mohammed also alleges another incident occurred

on March 16, 2023:

> 133. Dr. Xia accused Plaintiff of not doing something he thought he was
> required to do. He interrogated Plaintiff intensely about this and even
> warned that Dr. Fu would yell at Plaintiff about it.
>
> 134. After Dr. Xia realized he was mistaken, he did not apologize to
> Plaintiff.

Filing No. 1 at 16 (¶¶ 133–34). Mohammed also alleges that Xia misled Mohammed

about his eligibility for a National Institutes of Health loan repayment program during his

"salary negotiations for this job" and again in January and February of 2023, but

Mohammed eventually "realized that he was lied to and never actually qualified for this

program," which "caused Plaintiff a great deal of stress and anxiety." *Id.* at 23 (¶¶ 168–

72).

### d. The Instances of Alleged Retaliation

#### i. *Alleged Retaliation by Fu*

Mohammed alleges retaliation by Fu to both Mohammed's complaints about

unpaid overtime and his complaints about discrimination and harassment by Fu and Xia.

He alleges that "[i]n retaliation for reporting unpaid overtime [on April 17, 2023,] Dr. Xia

and Dr. Fu made false accusations about Plaintiff to HR and the Biomedical Sciences

administration respectively on April 19, 2023." Filing No. 1 at 17 (¶ 137). Fu's allegations

to an administrator of the Biomedical Sciences Department included that Mohammed had accused her of breaking the law and threatened her, had unwarranted mood changes that made her believe that he was "unpredictable," and had negatively impacted her emotional well-being and sense of safety in the workplace. *Id.* (¶ 138). He also alleges, "In retaliation for reporting unpaid overtime, Dr. Fu cc'd the CFO and director of Plaintiff's department on May 4, 2023, and made negative false statements about Plaintiff's work ethic in an email thread regarding the new terms and conditions of Plaintiff's employment." *Id.* at 18 (¶ 141).

Mohammed alleges that after he submitted a "formal complaint" to HR on May 1, 2023, about harassment by Xia, Fu retaliated against him on May 3, 2023, by imposing "different terms and conditions of employment" on him. Filing No. 1 at 17 (¶¶ 139–40). Those different terms and conditions consisted of rescinding his ability to work remotely and "enhanced supervision" to which a co-worker was not subjected. *Id.* at 17–18 (¶ 140). Mohammed also alleges that on May 19, 2023, Xia received notification that Mohammed had accused him of discriminatory behavior and that Xia was being investigated under Title IX. *Id.* at 18 (¶ 142). Mohammed alleges that Fu then informed him on May 23, 2023, "in retaliation for Plaintiff's [unspecified] complaints" that he would no longer be listed as first author on a cancer research project that he was working on with her, despite having promised that he would be first author on January 19, 2023. *Id.* (¶ 143). Mohammed alleges that he "reported this to HR on May 23, 2023, and to T9-CRC [the body that investigates Title IX complaints] on May 24, 2023." *Id.* (¶ 143).

Mohammed alleges that Fu took other actions "[i]n retaliation for Plaintiff's complaints"—again without specifying whether the complaints were about overtime or

discrimination—on June 5, 2023. Filing No. 1 at 18 (¶ 144). That "retaliation" included

that Mohammed would not be listed as an author at all on the cancer research project—

which was "a major setback for Plaintiff's career"—and that he could no longer work on

her lab projects unless she submitted a data analysis service request to IGBC. *Id.* at 18–

19 (¶¶ 144–45). Mohammed alleges additional retaliatory actions by Fu related to his

involvement in a research paper and training. *Id.* at 19–20 (¶¶ 146–56).

### ii. Alleged Retaliation by Xia

Mohammed also alleges retaliation by Xia to both Mohammed's complaints about

unpaid overtime and his complaints about discrimination and harassment by Fu and Xia.

He alleges, "In retaliation for Plaintiff reporting unpaid overtime, Dr. Xia reported false

accusations about him to HR on April 19, 2023," related to the confrontation about

overtime on April 17, 2023. Filing No. 1 at 21 (¶ 158). Xia's complaint to HR claimed

Mohammed was confrontational, shouted, appeared unstable, intimidated Xia, and made

Xia feel unsafe. *Id.* at 21–22 (¶ 159). Mohammed also alleges, "In retaliation for Plaintiff's

[unspecified] complaints," Xia told a user of IGBC's services not to use a service for which

Mohammed was responsible. *Id.* at 22 (¶¶ 160–66).

### e. The Different Treatment of Similarly Situated Persons

Mohammed cites two instances of allegedly similarly situated individuals outside

of his protected class being treated more favorably, both in relation to alleged retaliation

by Fu. Filing No. 18 at 8. His first allegation is that on May 3, 2023, Fu subjected him to

different terms and conditions of employment consisting of enhanced supervision

requiring him to submit daily work summaries and to scan his identity card whenever he

arrived at or left work, but a coworker, "Ms. Na Zhong, was not required to do this." Filing

No. 1 at 18 (¶ 140 B & C); *see also id.* at 24 (¶ 181) (alleging that Mohammed was "subjected to new terms and conditions of employment that his East Asian co-worker was not," identify the same conditions). The second allegation is that as a consequence of retaliatory actions by Fu,

> 157.   Plaintiff is 2 years into his career but has a lot less experience with NGS data analysis to display on his portfolio compared to other bioinformaticians with similar years of experience. He also never gained any hand-on experience with NGS library preparation.

Filing No. 1 at 20 (¶ 157).

### 4.   The "Aftermath"

Mohammed alleges that on August 23, 2023, he was informed that Fu would no longer be his supervisor, and on November 9, 2023, he was informed that Fu would no longer be providing him with guidance for his work. Filing No. 1 at 12 (¶¶ 173–75). Mohammed also alleges the following:

> 178.    On May 11, 2024, Dr. Fu was promoted to the position of Assistant Professor, a tenure track position.
>
> 179.   At the beginning of June 2024, she left Creighton University. At the beginning of November 2024, Dr. Xia also left the institution.
>
> 180.   December 2024, Plaintiff was terminated from Creighton University. They offered Plaintiff approximately $6,000.00 severance if he signed an agreement that would have prevented him from filing this Complaint.

Filing No. 1 at 24 (¶¶ 178–80). Mohammed alleges that, because of the discrimination and retaliatory actions, he "was deprived of valuable experience in the highly technical field," which caused "long-term professional harm," and that he also suffered "significant emotional distress." *Id.* at 27 (¶¶ 184–86).

## B. Procedural Background

Mohammed filed his Complaint in this action on December 9, 2024, alleging nine causes of action. Filing No. 1. He asserts two claims under NFEPA. Count I is captioned, "Racial Discrimination Under the Nebraska Fair Employment Act (Against all Defendants)." *Id.* at 27 (emphasis omitted). Count II is captioned, "Retaliation Under the Nebraska Fair Employment Act (Against all Defendants)." *Id.* at 28 (emphasis omitted).

Mohammed also asserts four claims under federal statutes. Count III is captioned, "42 U.S.C. § 1981 Retaliation (Against all Defendants)." Filing No. 1 at 29 (emphasis omitted). Count IV is captioned, "42. [sic] U.S.C. § 2000(e)-2(m), *et seq*. ('Title VII') Racial Discrimination by an Employer (Against all Defendants)." *Id.* (emphasis omitted).[1] Count V is captioned, "42. [sic] U.S.C. § 2000(e)-2(m), *et seq*. ('Title VII') Race Discrimination Constituting Hostile Work Environment (Against Creighton University)." *Id.* at 30 (emphasis omitted).[2] Count VI is captioned, "42 U.S.C. § 1983 Unconstitutional Official

---

[1] There is no 42 U.S.C. § 2000(e). Rather, Title VII of the Civil Rights Act of 1964 is codified at 42 U.S.C. § 2000e *et seq*. Furthermore, § 2000e-2(m), which does exist, does not prohibit any employment practices. Instead, § 2000e-2(m) provides only a standard of proof for relief: "Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). Prohibited employment practices by employers are set out in Title VII by 42 U.S.C. § 2000e-2(a), which provides as follows:

> (a) Employer practices
> It shall be an unlawful employment practice for an employer--
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a). The language Mohammed uses to identify the prohibited conduct at issue in Count IV is found in 42 U.S.C. § 2000e-2(a)(2). *See* Filing No. 1 at 29 (¶ 213).

[2] Again, Mohammed erroneously cites 42 U.S.C. § 2000(e)-2(m), which does not exist, as the basis for this claim, but the prohibition on a hostile environment under Title VII is drawn from 42 U.S.C. § 2000e-2(a)(1). *Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1083 (8th Cir. 2010) ("Title VII prohibits a racially hostile

Policy; Failure to Investigate, Supervise and Train (Against all Defendants)." Filing No. 1 at 32 (emphasis omitted).

The last three Counts of Mohammed's Complaint assert causes of action under Nebraska common law. Count VII is captioned, "Intentional Infliction of Emotional Distress (Against all Defendants)." Filing No. 1 at 32–33 (emphasis omitted). Count VIII is captioned, "Unintentional Infliction of Emotional Distress (Against Dr. Fu)." *Id.* at 33 (emphasis omitted). Count IX is captioned, "Defamation/Libel and Slander (Against Dr. Fu and Dr. Xia)." *Id.* at 34 (emphasis omitted).

On March 10, 2025, Defendants filed the Motion to Dismiss now before the Court. Filing No. 16. In their Motion, "Defendants respectfully request[ ] the Court to dismiss Plaintiff's Complaint in its entirety without leave to amend and grant such other relief as the Court deems just and proper." *Id.* at 1. Mohammed filed his Opposition Brief on March 30, 2025, Filing No. 18, and Defendants filed their Reply Brief on April 7, 2025, Filing No. 19. The Motion is now fully submitted.

## II. LEGAL ANALYSIS

### A. Standards for Rule(b)(6) Dismissal

Fed. R. Civ. P. 12(b)(6) provides for a pre-answer motion to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Although Mohammed asserts a mix of state and federal claims, federal courts "appl[y] federal pleading standards . . . to the state substantive law to determine if a complaint makes out

---

work environment." (citing 42 U.S.C. § 2000e–2(a)(1))), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011). 42 U.S.C. § 2000e-2(a)(1) prohibits an employer from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race. . . ."

a claim under state law." *Christopherson v. Bushner*, 33 F.4th 495, 499–500 (8th Cir. 2022) (cleaned up).

The typical ground for a Fed. R. Civ. P. 12(b)(6) motion is the insufficiency of the factual allegations offered to state claims. To state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Nevertheless, "'threadbare recitals of the elements of a cause of action' cannot survive a [Rule 12(b)(6)] motion to dismiss." *Du Bois v. Bd. of Regents of Univ. of Minnesota*, 987 F.3d 1199, 1205 (8th Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Instead, as the Eighth Circuit Court of Appeals has explained, "A claim survives a Fed. R. Civ. P. 12(b)(6) motion to dismiss only if the complaint's nonconclusory allegations, accepted as true, make it not just 'conceivable' but 'plausible' that the defendant is liable." *Mitchell v. Kirchmeier*, 28 F.4th 888, 895 (8th Cir. 2022) (quoting *Iqbal*, 556 U.S. at 680–83). To put it another way, a court "must determine whether a plaintiff's complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Far E. Aluminium Works Co. v. Viracon, Inc.*, 27 F.4th 1361, 1364 (8th Cir. 2022) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009)).

"A claim is plausible when 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Christopherson*, 33 F.4th at 499 (quoting *Iqbal*, 556 U.S. at 678). In contrast, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility." *Id.* (internal quotation marks and citations omitted). The Eighth Circuit Court of Appeals has cautioned that "the complaint should

be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden*, 588 F.3d at 594.

In ruling on a Fed. R. Civ. P. 12(b)(6) motion, a court must "accept 'the facts alleged in the complaint as true and draw[ ] all reasonable inferences in favor of the nonmovant.'" *Bauer*, 25 F.4th at 589 (quoting *Pietoso, Inc.*, 4 F.4th at 622). On the other hand, "[m]ere conclusory statements and factual allegations lacking enough specificity to raise a right to relief above the speculative level are insufficient to support a reasonable inference that the defendant is liable." *Richardson v. BNSF Ry. Co.*, 2 F.4th 1063, 1068 (8th Cir. 2021) (internal quotation marks and citations omitted). A court also need not accept a pleader's "legal conclusions drawn from the facts." *Knowles v. TD Ameritrade Holding Corp.*, 2 F.4th 751, 755 (8th Cir. 2021).

The Court will apply these standards first to Mohammed's claims against the individual Defendants, Fu and Xia, under the NFEPA and Title VII in Counts I, II, and IV. The Court will then consider in turn Mohammed's claims against the University for racial discrimination under NFEPA and Title VII (Counts I and IV), retaliation under NFEPA (Count II), and a hostile work environment under Title VII (Count V). Next, the Court will consider Mohammed's claims against all Defendants under 42 U.S.C. §§ 1981 and 1983 (Counts III and VI). Finally, the Court will consider Mohammed's Nebraska common-law claims, consisting of his claim of intentional infliction of emotional distress against all Defendants (Count VII), unintentional infliction of emotional distress against Fu (Count VIII), and defamation against Fu and Xia (Count IX).

**B.  The NFEPA and Title VII Claims Against Fu and Xia in Counts I, II, and IV**

Defendants argue that the Eighth Circuit Court of Appeals has unequivocally held that supervisors cannot be held liable under Title VII.  Filing No. 17 at 9.  Defendants argue that because the NFEPA is patterned after Title VII, Courts have routinely held that individual supervisors cannot be held liable under the NFEPA, either.  *Id.* Mohammed responds, "Plaintiff concedes that the claims against Dr. Fu and Dr. Xia individually under Title VII and NFEPA should be dismissed."  Filing No. 18 at 6.

The Court agrees that these statutory claims against the individual Defendants must be dismissed.  *See McCullough v. Univ. of Arkansas for Med. Scis.*, 559 F.3d 855, 860 n.2 (8th Cir. 2009) ("[I]ndividual employees cannot be personally liable under Title VII." (citing *Bonomolo-Hagen v. Clay Cent.-Everly Cmty. Sch. Dist.*, 121 F.3d 446, 447 (8th Cir. 1997) (per curiam)); *Van Horn v. Best Buy Stores, L.P.*, 526 F.3d 1144, 1147 (8th Cir. 2008) (explaining that Title VII "does not provide for an action against an individual supervisor" (citing *Bales v. Wal-Mart Stores, Inc.*, 143 F.3d 1103, 1111 (8th Cir. 1998)); *Davis v. Ricketts*, No. 8:11CV221, 2011 WL 9369010, at *3 (D. Neb. Nov. 14, 2011) (stating the plaintiff's Title VII and NFEPA claims could not be brought against a supervisor), *aff'd*, *Davis v. Ricketts*, 765 F.3d 823 (8th Cir. 2014).

Therefore, Counts I, II, and IV are dismissed as to Fu and Xia for failure to state claims against individuals upon which relief can be granted.[3]

---

[3] Count V, the Title VII hostile environment claim, was not asserted against Fu and Xia but only "Against Creighton University."  Filing No. 1 at 30.  The Court will consider that claim below.

**C. The Race Discrimination, Retaliation, and Hostile Environment Claims Against the University in Counts I, II, IV, and V**

   **1. The Race Discrimination Claims against the University in Counts I and IV**

      **a. The Claims**

Count I of Mohammed's Complaint alleges "Race Discrimination Under the Nebraska Fair Employment Act." Filing No. 1 at 27 (emphasis omitted). In essence, it alleges that Mohammed "suffered adverse employment actions on the basis of his racial group and skin color" including but not limited to "termination, harassment, bullying, discrimination, and hampering Plaintiff's career," while "[s]imilar employees outside of Plaintiff's protected class were treated more favorably," which "suggest[s] a discriminatory motive by Defendants." *Id.* (¶¶ 190–91).

Count IV is captioned, "42. U.S.C. § 2000(e)-2(m) [sic], *et seq.* ('Title VII') Racial Discrimination by an Employer (Against all Defendants)." Filing No. 1 at 29 (emphasis omitted). The gravamen of this claim is the following:

> 213. Defendant's [sic] actions segregated and classified the Plaintiff on the basis of his race, and as a result deprived the Plaintiff of employment opportunities. This constitutes unlawful discrimination under Title VII of the Civil Rights Act, and as direct and proximate result of Defendant's violations of Title VII, Plaintiff has suffered and is still suffering damages including, without limitation, actual and consequential damages for economic loss.

Filing No. 1 at 29.

Defendants argue that both race discrimination claims must be dismissed for failure to state claims upon which relief can be granted.

      **b. The Parties' Arguments**

Defendants argue that the Court cannot reasonably infer that Mohammed suffered any adverse action because of a protected characteristic. Filing No. 17 at 11. They argue

that the only allegations of discriminatory conduct are Xia's alleged comments about certain individuals being privileged in academia. Filing No. 1 at 11. However, they argue that Xia was not Mohammed's supervisor, that Xia did not engage in any activity that could be considered an adverse action under the law, and that none of the allegations cited by Mohammed demonstrate discrimination based on race or color. *Id.* Defendants argue that at most Mohammed has pointed to stray and isolated comments with no nexus to any adverse employment action. *Id.* at 11–12. They argue that conclusory allegations of disparate treatment are insufficient to permit an inference of discrimination. *Id.* at 12. Defendants also argue that Mohammed has failed to plead any facts that plausibly suggest a similarly situated individual was treated differently in a way that suggests that the University's actions were motivated by race. *Id.*

Mohammed responds that he has sufficiently pleaded the elements of a prima facie case of race discrimination. Filing No. 18 at 7. He argues, "The Complaint outlines multiple instances where Plaintiff was excluded from key opportunities, denied necessary support, and ultimately terminated under circumstances different from similarly situated employees." *Id.* at 7–8 (citing Filing No. 1 at 17 and 21(¶¶ 140, 157)). He also argues that Defendants "mischaracterize" his allegations as "conclusory," but he sets out specific discriminatory comments by Xia in his employment environment showing a workplace culture of discrimination. Filing No. 18 at 8. Mohammed asserts that a pattern of adverse actions, such as he suffered, can support a discrimination claim. *Id.*

In reply, Defendants assert that Mohammed makes an unfounded leap from Xia's statements about "brown people" to an inference of discrimination and adverse employment action based on race. Filing No. 19 at 5. Defendants argue that Mohammed

fails to plead any facts suggesting that Xia was a decisionmaker related to any adverse actions at issue or to plead any additional facts to establish a discriminatory animus toward Mohammed's race. *Id.* at 5–6. Defendants argue that Mohammed's "belief" is insufficient to support a discrimination claim. *Id.* at 6. Defendants also argue that Mohammed's reliance on "cumulative acts" relates to retaliation not to discriminatory intent. *Id.*

### c. Mohammed Does Not Plausibly Plead Race Discrimination

The Eighth Circuit has explained that the analysis of claims of race discrimination under Title VII and NFEPA "is identical." *Walker v. First Care Mgmt. Grp., LLC*, 27 F.4th 600, 604 (8th Cir. 2022). Therefore, the Court will consider these two claims together.

#### i. Xia's Stray Remarks Are Not Direct Evidence of Discrimination

Discrimination claims require proof of discriminatory intent by the defendant. *Warren v. Kemp*, 79 F.4th 967, 973 (8th Cir. 2023) (explaining that this requirement applies to a § 1981 claim and a Title VII claim). Although Mohammed never uses the term "direct evidence" in his Complaint or in relation to the sufficiency of his allegations of race discrimination in his brief, it appears that he suggests that Xia's comments about "brown people" are such direct evidence of a racial motive for the ill treatment he suffered. They are not. As the Eighth Circuit Court of Appeals has explained, "'Direct evidence . . . must relate to people with decision-making authority' and does not include 'stray remarks in the workplace' or 'statements by nondecisionmakers.'" *Sellars v. CRST Expedited, Inc.*, 13 F.4th 681, 693 (8th Cir. 2021) (quoting *Moody v. Vozel*, 771 F.3d 1093, 1096 (8th Cir. 2014)); *Button v. Dakota, Minnesota & E. R.R. Corp.*, 963 F.3d 824, 832 (8th Cir. 2020) ("[S]tray remarks in the workplace, statements by nondecisionmakers, and statements by

decisionmakers unrelated to the decisional process do not constitute direct evidence." (quoting *Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961, 966 (8th Cir. 2006)). Statements made months before the plaintiff was fired likewise are not direct evidence. *Sherman v. Berkadia Com. Mortg. LLC*, 956 F.3d 526, 532 (8th Cir. 2020).

The comments by Xia about "brown people" that Mohammed relies upon allegedly occurred in March of 2023, more than a year before his termination. *See* Filing No. 1 at 5 (¶ 47) (alleging that the comments occurred on March 14, 2023); *but see id.* (¶ 40) (alleging the comments were made on March 14, 2024). Thus, their temporal remoteness provides no plausible inference that they are direct evidence of discrimination in Mohammed's termination. *See Sherman*, 956 F.3d at 532. Furthermore, stray racist or bigoted comments alone are not sufficient to generate an inference of racially discriminatory intent. *See Jones v. McNeese*, 746 F.3d 887, 897 n.7 (8th Cir. 2014) (citing *Clearwater v. Indep. Sch. Dist. No. 166*, 231 F.3d 1122, 1126 (8th Cir. 2000), and *Simmons v. Oce-USA, Inc.*, 174 F.3d 913, 915–16 (8th Cir. 1999)). This is so, because "[n]ot every act committed by [a] person who has made bigoted comments is motivated by a discriminatory intent." *Hill v. Ruiz*, No. 220CV01569RFBNJK, 2022 WL 1084754, at *4 (D. Nev. Jan. 3, 2022). Mohammed has not alleged facts sufficient to connect Xia's comments about "brown people" to discriminatory intent for any conduct by Xia that interfered with Mohammed's employment. *Warren*, 79 F.4th at 973 (explaining that a plaintiff asserting a § 1981 or Title VII discrimination claim must establish *inter alia* discriminatory intent by the defendant in interfering with the plaintiff's employment). Mohammed merely speculates that any ill treatment by Xia toward him must be because

of Mohammed's race or skin color.  Such speculation does not state a claim.  *See Richardson*, 2 F.4th at 1068 ("Mere conclusory statements and factual allegations lacking enough specificity to raise a right to relief above the speculative level are insufficient to support a reasonable inference that the defendant is liable." (internal quotation marks and citations omitted)).

Moreover, Xia was not Mohammed's direct supervisor, even after he became Co-Director of IGBC with his wife in February 2023; rather, Mohammed expressly alleges that "Dr. Fu remained Plaintiff's sole supervisor."  Filing No. 1 at 2 (¶ 12); *see Sellars*, 13 F.4th at 693 (comments by "nondecisionmakers" are not "direct evidence"); *Button*, 963 F.3d at 832 (same). Thus, "[e]ven if [Xia's] statement[s] showed discriminatory intent, [they] cannot be direct evidence of discrimination because [Xia] was not a decisionmaker."  *Button*, 963 F.3d at 832.

Thus, Mohammed has not alleged any direct evidence of racial discrimination.

       *ii.*     *Mohammed Has Not Plausibly Alleged a Race Discrimination Claim*

The Eighth Circuit has explained,

> "In cases such as this one where no direct evidence of discrimination exists, the McDonnell Douglas framework for indirect evidence applies." *Heisler v. Nationwide Mut. Ins. Co.*, 931 F.3d 786, 794 (8th Cir. 2019). Under McDonnell Douglas, "the plaintiff has the burden of making a prima facie case of discrimination." *Id.* Here, [the plaintiff] must demonstrate that she "(1) is a member of a protected group; (2) was meeting the legitimate expectations of the employer; [and] (3) suffered an adverse employment action;  .  .  .  (4) under circumstances permitting 'an inference of discrimination.'" *Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 926 (8th Cir. 2007) (alterations in original) (citations omitted), abrogated on other grounds by *Cole v. Grp. Health Plan, Inc.*, 105 F.4th 1110 (8th Cir. 2024). Only after this prima facie showing has been made does the burden shift to the employer of "articulating a legitimate, nondiscriminatory reason for the adverse employment action."  *Heisler*, 931 F.3d at 794.

*Parker v. United States Dep't of Agric.*, 129 F.4th 1104, 1111–12 (8th Cir. 2025). This requirement to plead circumstances sufficient to permit an inference of discrimination applies under either Title VII or NFEPA. *Brown v. Conagra Brands, Inc.*, 131 F.4th 624, 627 (8th Cir. 2025).

Stray remarks and statements by nondecisionmakers are not sufficient to establish an inference of discrimination under *McDonnell Douglas*. *See Norgren v. Minnesota Dep't of Hum. Servs.*, 96 F.4th 1048, 1056 (8th Cir. 2024). "[O]ccasional insensitive comments" are "'stray remarks' rather than 'persuasive evidence of motive when the remarks are made by persons other than a decisionmaker.'" *Xuan Huynh v. U.S. Dep't of Transp.*, 794 F.3d 952, 959 (8th Cir. 2015) (quoting *Hitt v. Harsco Corp.*, 356 F.3d 920, 925 (8th Cir. 2004)). Thus, Mohammed's pleading of comments by Xia, a nondecisionmaker—amounting only to "occasional insensitive comments" about perceived preferences for "brown people" in academia—are not enough to plausibly allege the required inference of discrimination. *Id.* Furthermore, none of the comments attributed to Xia were references to Mohammed, his race, or his skin color, so that they do not plausibly raise an inference of discrimination against Mohammed. Once again, Mohammed merely speculates that any ill treatment by Xia toward him must be because of Mohammed's race or skin color. Such speculation does not state a claim. *See Richardson*, 2 F.4th at 1068 ("Mere conclusory statements and factual allegations lacking enough specificity to raise a right to relief above the speculative level are insufficient to support a reasonable inference that the defendant is liable." (internal quotation marks and citations omitted)).

One way a plaintiff can generate the required inference of discrimination is by showing that similarly situated employees outside of his or her protected class were

treated differently. *Meinen v. Bi-State Dev. Agency*, 101 F.4th 947, 951 (8th Cir. 2024). A plaintiff does not sufficiently plead that similarly situated employees were treated more favorably if the plaintiff pleads only that he or she was subjected to a stricter level of scrutiny than nonmembers of the plaintiff's protected class; rather, the plaintiff must plead that the comparators were "similarly situated in all relevant respects" to the plaintiff. *Ingram v. Arkansas Dep't of Correction*, 91 F.4th 924, 928 (8th Cir. 2024) (quoting *Blackwell v. Alliant Techsystems, Inc.*, 822 F.3d 431, 435 (8th Cir. 2016)). Thus, where the plaintiff and the comparators do not share the same job duties, or did not engage in conduct of comparable seriousness, they are not sufficiently similarly situated to give rise to an inference of discrimination. *Id.*

Mohammed has not plausibly or adequately pleaded different treatment of any similarly situated person to create the inference of discrimination that Xia's comments failed to generate. As in *Ingram*, Mohammed has pleaded only that a co-worker who was a nonmember of his protected class—identified as "Ms. Na Zhong," Filing No. 1 at 18 (¶ 140), and an "East Asian" individual, *id.* at 24 (¶ 181)—was treated to less strict scrutiny than he was, but Mohammed has not pleaded that his comparator was similarly situated in any respect other than the conclusory statement that they were "co-workers." *See Ingram*, 91 F.4th at 928 (explaining that the comparators must be similarly situated in all relevant respects). Mohammed leaves entirely to speculation or the imagination whether he and Ms. Na Zong had the same or similar job duties and whether they engaged in conduct of comparable seriousness. *Id.*; *see also Richardson*, 2 F.4th at 1068 ("Mere conclusory statements and factual allegations lacking enough specificity to raise a right to relief above the speculative level are insufficient to support a reasonable inference that

the defendant is liable." (internal quotation marks and citations omitted)).  Mohammed's allegation that he "has a lot less experience with NGS data analysis to display on his portfolio compared to other bioinformaticians with similar years of experience," Filing No. 1 at 21 (¶ 157), is even more inadequate.  That allegation does not identify any specific comparators let along comparators employed in the same department or by the University or that such comparators are similarly situated in all other relevant respects.  *See* *Ingram*, 91 F.4th at 928.

Finally, Mohammed suggests that a pattern of mistreatment is sufficient to generate an inference of discrimination.  Filing No. 18 at 8.  The Eighth Circuit has rejected the suggestion that allegations of "instances of a subordinate employee being subjected to the criticism and control of a supervisor"—and Fu was Mohammed's supervisor, but Xia was not—are insufficient to generate an inference of discrimination. *Xuan Huynh*, 794 F.3d at 959.  Even if Fu (and Xia) "forcefully criticized" Mohammed, "their comments 'did not suggest any reference to race or national origin' nor did they support 'an inference of discriminatory intent.'" *Id.* (quoting *Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1047–48 (8th Cir. 2003)).  Also, Mohammed's own pleadings allege that Fu and Xia gave Mohammed additional chances and additional instructions when they could have fired him based on their perceptions of his inadequate or insubordinate performance. *Id.* (finding that "the summary judgment record establishes that air traffic manager Nelson, supervisor Santer, and instructors Martenson and Vance repeatedly gave [Plaintiff] Huynh second chances and additional instruction when they could have fired him," eliminating an inference of discriminatory intent).  Thus, Mohammed has failed to plead any facts plausibly suggesting actions or statements made by Fu or Xia "'create

a reasonable inference of discrimination,' as they 'do not suggest discriminatory animus without resorting to speculation.'" *Id.* at 959–60 (quoting *Takele v. Mayo Clinic*, 576 F.3d 834, 839 (8th Cir. 2009)).

The University—like the individual Defendants—is entitled to dismissal of Mohammed's race discrimination claims under the NFEPA and Title VII (Counts I and IV, respectively) for failure to state claims upon which relief can be granted. Those claims are now dismissed in their entirety.

### 2. The NFEPA Retaliation Claim Against the University Count II

#### a. The Claim

Count II of Mohammed's Complaint is captioned, "Retaliation Under the Nebraska Fair Employment Act (Against all Defendants)." Filing No. 1 at 28 (emphasis omitted). The gravamen of this claim is that Mohammed "engaged in protected conduct when they [sic] complained about race-based discrimination," and "Defendants subjected Plaintiff to adverse employment actions [causally connected to his protected conduct], including termination and a change in how they [sic] could perform their [sic] duties when compared to similarly situated employees." *Id.* (¶¶ 195–197). As explained in § II.B., this claim has already been dismissed as to the individual Defendants. Defendants argue that this claim should also be dismissed as to the University.

#### b. The Parties' Arguments

Defendants argue that Mohammed fails to allege anything but minor changes in duties or working conditions or any injury or harm from those changes, so that he has not alleged sufficiently adverse action to support a retaliation claim. Filing No. 17 at 14. Defendants argue that Mohammed fails to allege that time-tracking requirements led to

write-ups or other discipline. *Id*. Furthermore, Defendants argue that Mohammed's own allegations reveal other nondiscriminatory explanations for the conduct he alleges, such as refusing to answer phone calls from Xia or to notify Xia that he would be missing a meeting. *Id*. Defendants also allege that Mohammed fails to allege any causal connection between reporting race discrimination and the alleged adverse employment actions. *Id*. at 15. Defendants explain that Fu was the decisionmaker, but Mohammed does not allege that she knew that he had reported discrimination on May 1, 2023, although he alleges that Xia was aware of his complaints on May 19, 2023. *Id*. Defendants argue that Mohammed has not pleaded that reporting race discrimination was the "but-for" cause of any of the alleged adverse employment actions. *Id*. Defendants point out that Mohammed was terminated by the University in December 2024, more than a year after his report on May 1, 2023, several months after Fu left the University, and a month after Xia left the University. *Id*. at 15–16; *see also* Filing No. 1 at 24 (¶¶ 179–80) (alleging when Mohammed was terminated and when Xia and Fu left the University).

Mohammed argues that he has alleged adverse actions that might have dissuaded a reasonable worker from reporting allegedly unlawful practices, including termination, recission of remote work privileges, enhanced supervision, and exclusion from research and authorship credit. Filing No. 18 at 10. He argues that these actions were not "minor changes" but substantial professional setbacks resulting in harm to his career prospects. *Id*. He argues that inferences of causation plausibly arise from the short time between his May 1, 2023, complaint the May 19, 2023, notice of that complaint to Defendants "including Dr. Xia," and the imposition of increased scrutiny and exclusion from research. *Id*. at 11. He likewise asserts that a pattern of retaliation closes the purported 19-month

gap between his report of discrimination and his termination. *Id.* Mohammed also points to his allegation that but for his complaint of race-based discrimination, he would not have suffered these adverse actions, which he asserts is sufficient to support his claim past the motion-to-dismiss stage. *Id.* (citing *Blomker v. Jewell*, 831 F.3d 1051 (8th Cir. 2016)). He also asserts that it is improper for the Court to consider purported justifications for adverse actions at this stage of the litigation. *Id.*

In reply, Defendants continue to dispute the sufficiency of the alleged adverse actions. Filing No. 19 at 7. They also argue that there is no authority that a 19-month gap between protected activity and termination establishes causation. *Id.* Defendants dispute Mohammed's reliance on *Blomker* because Mohammed does not allege that all Defendants were even aware of the protected activity. *Id.* at 7–8. Defendants argue that Mohammed instead relies on conclusory and subjective allegations that there was a series of adverse actions based on race. *Id.* at 8.

### c. Mohammed Does Not Plausibly Plead a Casual Connection Between Protected Conduct and Adverse Action

#### i. *Applicable Standards*

In retaliation cases under NFEPA or Title VII, the plaintiff "must [make] a prima facie case showing three elements: (1) [he] engaged in statutorily protected activity; (2) the employer took an adverse action against [him]; and (3) . . . a causal connection [existed] between the adverse action and the protected activity" (internal quotation marks and citation omitted). *Canning v. Creighton Univ.*, 995 F.3d 603, 615 (8th Cir. 2021). As to the "protected activity" element, the plaintiff must have an objectively reasonable belief that an actionable violation of the law in question has occurred for his or her complaint about conduct to qualify as protected activity. *Gibson v. Concrete Equip. Co., Inc.*, 960

F.3d 1057, 1064–65 (8th Cir. 2020) (citing *Brannum v. Missouri Dep't of Corr.*, 518 F.3d 542, 548–49 (8th Cir. 2008)).  Under NFEPA or Title VII, a plaintiff must also sufficiently allege facts to infer a "causal connection" between his or her protected activity and the adverse employment action.  *Brown*, 131 F.4th at 627–28 (citing *Knapp v. Ruser*, 901 N.W.2d 31, 48 (Neb. 2017), for this requirement for a NFEPA retaliation claim).

"For retaliation claims '[i]t is unclear whether a causal connection under the NFEPA requires but-for causation, or only requires the protected activity to be a motivating factor for the adverse employment action.'" *Canning*, 995 F.3d at 610 (quoting the decision below, *Canning v. Creighton Univ.*, No. 4:18-CV-3023, 2019 WL 4671180, at *10 (D. Neb. Sept. 25, 2019), in turn citing *Ludlow v. BNSF Ry. Co.*, 788 F.3d 794, 802 (8th Cir. 2015)).  Nevertheless, the distinction between these standards may not be material under the circumstances of the case.  *Id.* This is so because under either standard, "temporal proximity alone does not support an inference of retaliation," so a plaintiff must allege something more to establish causation.  *Brown*, 131 F.4th at 628.  Furthermore, the causal link is broken if the plaintiff fails to establish that the decisionmaker "had any awareness of [the plaintiff's] protected activity" at the time of the adverse action.  *Schottel v. Nebraska State Coll. Sys.*, 42 F.4th 976, 983 (8th Cir. 2022).  The causal link is also broken when an employer's "lawful, obvious alternative explanation for the alleged conduct" renders a plaintiff's theory of causation based on temporal proximity implausible.  *Id.* at 984.  Thus, where a plaintiff's complaint includes reasons for adverse action that are unrelated to protected activity, those allegations make a causal connection to protected activity implausible. *Blomker v. Jewell*, 831 F.3d 1051, 1059–60 (8th Cir. 2016).

*ii. Mohammed's Insufficient Allegations*

Some of Mohammed's allegations of retaliatory action are expressly identified as retaliation for reporting unpaid overtime on April 17, 2023. *See* Filing No. 1 at 17, 18, and 21 (¶¶ 137, 141, 158). Mohammed has not pointed to—and the Court has not found—any allegations in Mohammed's Complaint expressly stating or plausibly suggesting that any denial of overtime pay was based on Mohammed's race or skin color. Thus, there are no allegations plausibly suggesting that Mohammed could have reasonably believed that his complaints about overtime pay were complaints about race discrimination in violation of the NFEPA that would support a NFEPA retaliation claim. *See Gibson*, 960 F.3d at 1064–65 (explaining that the plaintiff must have an objectively reasonable belief that an actionable violation of the law in question has occurred for his or her complaint about conduct to qualify as protected activity). Here, allegations of retaliation for reporting failure to pay overtime do not plausibly support Mohammed's NFEPA retaliation claim. *Blomker*, 831 F.3d at 1059–60 (explaining that where a plaintiff's complaint includes reasons for adverse action that are unrelated to protected activity, those allegations make a causal connection to protected activity implausible).

Other allegations are that Fu and Xia took certain actions "[i]n retaliation for [Mohammed's] complaints," without specification of whether the complaints were about overtime or mistreatment based on race. *See* Filing No. 1 at 18, 19, and 22 (¶¶ 143–45, 49, 60). The Court might reasonably infer that the "complaints" in question in ¶¶ 144–45 related to Xia receiving notification on May 19, 2023, that Mohammed had accused him of discriminatory behavior and that he was being investigated by T9-CRC, as set out in the immediately preceding paragraph. *See* Filing No. 1 at 18 (¶ 142). However, the

inference breaks down because the person who allegedly retaliated against Mohammed for this complaint is identified in ¶¶ 143–45 and ¶ 149 as Fu rather than Xia, and Mohammed does not allege that Fu knew of the complaints against Xia. *See Schottel, 42 F.4th at 983* (explaining that the plaintiff must establish (or in this situation plausibly plead) that the decisionmaker "had any awareness of [the plaintiff's] protected activity" at the time of the adverse action). Thus, Mohammed relies on mere speculation that Fu necessarily knew about every complaint against Xia because they were married. This is true of all the other allegedly retaliatory actions by Fu alleged in Filing No. 1 at 18–21 (¶¶ 145–56). Such speculation is not enough, because at most it makes it possible that Fu knew of and retaliated for Mohammed's reports about Xia, but it is not enough to nudge Mohammed's allegations across the line between possibility and plausibility. *Christopherson, 33 F.4th at 499* (explaining that "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility" (internal quotation marks and citations omitted)).

There is an even larger problem with the unspecified "complaints" that allegedly led to "retaliation" by Xia. Filing No. 1 at 22 (¶ 160). The immediately preceding allegation is that retaliation by Xia on April 19, 2023, was because of Mohammed "reporting unpaid overtime," not race-based conduct that Mohammed could have objectively believed was protected by NFEPA. *See Gibson, 960 F.3d at 1064*–65. Also problematic is that the retaliation at issue—turning someone away from utilizing IGBC's data analysis service for which Mohammed was responsible—allegedly occurred on or about June 30, 2023, at the outer limits of what the Eighth Circuit has identified as temporal proximity sufficient to raise an inference of a causal connection without other evidence. *See Brown, 131 F.4th*

at 628 (holding that three months was not sufficient temporal proximity alone to establish the causal connection, and citing *Lors v. Dean*, 746 F.3d 857, 866 (8th Cir. 2014), as suggesting that more than two months is too long); *Meinen v. Bi-State Dev. Agency*, 101 F.4th 947, 951 (8th Cir. 2024) (explaining that "approximately one to two months" of separation was too much for temporal proximity alone to suggest a causal connection). Thus, these allegations also do not plausibly support a NFEPA retaliation claim.

Mohammed also alleges that Fu and Xia engaged in retaliatory actions "[f]ollowing the Plaintiff's complaints about the unpaid overtime and discriminatory treatment." Filing No. 1 at 24, 26 (¶¶ 182, 183). However, these "blended complaints" are reallegations of the purported retaliatory actions by Fu and Xia alleged in Filing No. 1 at 17–22 (¶¶ 137–166). The Court has already determined those allegations are insufficient to plausibly plead a causal connection.

The causal connection is not plausibly alleged for at least two other reasons. First, Mohammed's own allegations set out "lawful, obvious alternative explanation[s] for the alleged [retaliatory] conduct," rendering Mohammed's theory of causation implausible. *Schottel*, 42 F.4th at 984; *Blomker*, 831 F.3d at 1059–60 (explaining that where a plaintiff's complaint includes reasons for adverse action that are unrelated to protected activity, those allegations make a causal connection to protected activity implausible). Those allegations are that Mohammed did not pick up Xia's calls because Mohammed thought it was better to correspond by email, Filing No. 1 at 9 (¶¶ 74–78), missed an in-person meeting with Xia, *id.* at 10 (¶ 82), had been confrontational and threatening with Fu and Xia (even if Mohammed asserts those accusations are false), *id.* at 17, 21 (¶¶ 137–38, 158–59), and that he had a poor work ethic (again, even if Mohammed asserts that

accusation was false), Filing No. 1 at 18 (¶ 141).  Furthermore, for the same reasons that the Eighth Circuit has rejected the suggestion that allegations of "instances of a subordinate employee being subjected to the criticism and control of a supervisor" are insufficient to generate an inference of discrimination, *Xuan Huynh*, 794 F.3d at 959, the Court concludes that such allegations do not standing alone generate an inference of causal connection between protected activity and adverse action for purposes of a retaliation claim.

Finally, Mohammed's allegation that he was terminated in retaliation for his reports of race discrimination and harassment in violation of the NFEPA involves a 19-month separation between Mohammed's reports of discrimination in May of 2023 and his termination in December of 2024.  That time difference is well outside of the range of "temporal proximity" that could suggest a causal connection.  *See Meinen*, 101 F.4th at 951 (suggesting that approximately one or two months is too long). While Mohammed attempts to bridge the temporal gap by pointing to a pattern of retaliation, his insufficient allegations of that pattern, as explained above, do not plausibly suggest that the termination was causally connected to his protected activity.  Also, XIA and Fu were not the decisionmakers in Mohammed's termination because the termination occurred after Xia and Fu had already been separated from the University for either a month or several months, respectively, which also destroys the causal connection.

Thus, Defendants are entitled to dismissal of Mohammed's NFEPA retaliation claim in Count II for failure to state a claim upon which relief can be granted.

### 3. The Title VII Hostile Work Environment Claim in Count V

#### a. The Claim

Count V is captioned, "42. U.S.C. § 2000(e)-2(m) [sic], *et seq*. ('Title VII') Race Discrimination Constituting Hostile Work Environment (Against Creighton University)."

Filing No. 1 at 30 (emphasis omitted). The gravamen of this claim is the following:

> 216. Plaintiff, as a member of a protected class, was subject to repeated instances of harassment that disregarded and disrespected Plaintiff's human dignity by the Defendants.

> 217. The discrimination suffered by Plaintiff was illegal discrimination based on his race and skin color. The harassing conduct to which Plaintiff was subjected to was so severe, widespread, and/or persistent that a reasonable person in Plaintiff's circumstances would have considered the work environment to be hostile and/or abusive. Plaintiff considered the work environment to be hostile and/or abusive. Each Defendant failed to take prompt, remedial and effective action to stop the harassment.

Filing No. 1 at 30–31 (¶¶ 216–17). Defendants assert that this claim should be dismissed against the University, the sole Defendant on this claim.

#### b. The Parties' Arguments

Defendants assert that Mohammed's allegations of a hostile work environment "are nothing more than conclusory statements based on characterizing his interactions with Dr. Xia and Dr. Fu as 'hostile.'" Filing No. 17 at 16. Defendants assert that what few facts are alleged have no connection to Mohammed, his race, or his color. *Id*. Defendants summarize their argument as follows:

> Plaintiff's racially hostile work environment claim is subject to dismissal for three primary reasons: (1) Plaintiff has failed to plead any facts that the harassment by Creighton was due to his race or color; (2) none of the allegations related to race or skin color actually involve Plaintiff; and (3) the conduct Plaintiff complains of is not severe or pervasive enough to substantiate an actionable claim of hostile work environment based on race.

Filing No. 17 at 17.

Mohammed responds that Defendants do not address the legal standards for this claim and mischaracterize his allegations. Filing No. 18 at 12. He asserts that he has alleged that he is a member of a protected class based on his race and skin color and that he suffered unwelcome harassment, identifying again all the conduct by Fu and Xia he alleged was retaliatory. *Id.* at 12–13. He also argues that he has alleged harassment that was severe or pervasive enough to affect a term or condition of employment when the conduct alleged is "viewed collectively" instead of incident-by-incident. *Id.* at 13–14. As to the key part of Defendants' challenge to the pleading of the nexus between race or color and harassment, Mohammed argues,

> Plaintiff has alleged that Dr. Xia made comments reflecting bias and stereotypes based on race, including statements about individuals with brown skin being privileged or preferred in academia. While Defendants contend that these comments were not directed at Plaintiff, they reflect a discriminatory animus that influenced the treatment he received. Furthermore, Plaintiff has alleged that the enhanced supervision, removal from authorship, and other adverse actions were motivated by discriminatory perceptions of his race and skin color. These allegations are sufficient at the pleading stage to establish a connection between the harassment and Plaintiff's protected status.

Filing No. 18 at 13. In response to Defendants assertion that his allegations are conclusory, Mohammed argues, "[A]t the motion-to-dismiss stage, the court must accept Plaintiff's allegations as true and draw all reasonable inferences in his favor," but he "is not required to prove his case at this stage. . .." *Id.* at 14.

In reply, Defendants argue that Mohammed mistakenly assumes that just because he has alleged that he is a member of a protected group and examples of workplace conduct by Fu and Xia that he found subjectively unwelcome and "hostile," he has sufficiently pleaded a hostile work environment. Filing No. 19 at 9.

### a. Mohammed Does Not Plausibly Plead a Racially Hostile Work Environment

#### i. *Applicable Standards*

The Eighth Circuit recently explained,

> To establish a hostile work environment claim, [a plaintiff] must demonstrate that: "(1) she 'is a member of the class of people protected by [Title VII],' (2) she 'was subject to unwelcome harassment,' (3) 'the harassment resulted from [her] membership in the protected class,' and (4) 'the harassment was severe enough to affect the terms, conditions, or privileges of [her] employment.'" *Blake v. MJ Optical, Inc.*, 870 F.3d 820, 827 (8th Cir. 2017) (alterations in original) (citation omitted). While "[a]ny race-based harassment in the workplace is unreasonable and may, in turn, have the effect of interfering with an employee's performance . . . there must be evidence that the harassment was 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" *Watson v. McDonough*, 996 F.3d 850, 856 (8th Cir. 2021) (third alteration in original) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). "Not all unpleasant conduct creates a hostile work environment. Rather, the plaintiff must show that she was singled out because of her gender [or race], and that the conduct was severe and pervasive." *Williams v. City of Kansas City*, 223 F.3d 749, 753 (8th Cir. 2000) (citation omitted).

*Parker*, 129 F.4th at 1113.

In *Parker*, the plaintiff failed to establish "the required nexus between the complained of harassment and [her] protected status." *Id.* (quoting *Palesch v. Missouri Comm'n on Hum. Rts.*, 233 F.3d 560, 566 (8th Cir. 2000)). Specifically, the plaintiff "offer[ed] 'little more than speculation and conjecture to make the required connection from the mistreatment she alleges to a gender or race-based animus,' and without 'anything more than bare allegations,' she cannot establish the required nexus to prove her harassment claims." *Id.* (quoting *Palesch*, 233 F.3d at 567–68). The plaintiff also failed to show that her working conditions were sufficiently "severe or pervasive." *Id.* The Eighth Circuit explained, "While Parker 'had personality conflicts' with numerous coworkers and superiors, 'this is insufficient to satisfy the threshold level of evidence'

required to demonstrate a hostile work environment as Title VII does not 'impose a code of workplace civility.'" *Id.* (quoting *Palesch*, 233 F.3d at 567).

### ii. Even if Mohammed Pleaded Sufficiently Severe or Pervasive Harassment, He Does Not Plausibly Plead the Required Casual Connection to His Race

Mohammed's pleading of his racially hostile environment claim fails for the same reasons as the plaintiff's claim in *Parker*. Like the plaintiff in *Parker*, Mohammed has failed to show that his working conditions were sufficiently "severe or pervasive." 129 F.4th at 1113. Like Parker, Mohammed "had personality conflicts" with Xia and Fu, but "'this is insufficient to satisfy the threshold level of evidence' required to demonstrate a hostile work environment as Title VII does not 'impose a code of workplace civility.'" *Id.* (quoting *Palesch*, 233 F.3d at 567).

Moreover, even if Mohammed's allegations were sufficient to raise a plausible inference that his work environment was sufficiently "severe or pervasive," Mohammed has failed to plead plausibly "the required nexus between the complained of harassment and [his] protected status." *Id.* (quoting *Palesch*, 233 F.3d at 566). As in *Parker*, Mohammed "offers 'little more than speculation and conjecture to make the required connection from the mistreatment [he] alleges to a . . . race-based animus,' and without 'anything more than bare allegations,' [he] cannot establish the required nexus to prove [his] harassment claims." *Id.* (quoting *Palesch*, 233 F.3d at 567–68). As was the case with Mohammed's race discrimination and retaliation claims, "[O]ccasional insensitive comments" are "'stray remarks' rather than 'persuasive evidence of motive when the remarks are made by persons other than a decisionmaker.'" *Xuan Huynh*, 794 F.3d at 959 (quoting *Hitt v. Harsco Corp.*, 356 F.3d 920, 925 (8th Cir. 2004)). Thus, Mohammed's pleading of comments by Xia, a nondecisionmaker—amounting only to "occasional

insensitive comments" about perceived preferences for "brown people" in academia—are not enough to plausibly allege the required inference of discrimination. *Id.* Furthermore, none of the comments attributed to Xia were references to Mohammed, his race, or his skin color, so that they do not plausibly raise an inference of discrimination against Mohammed. Once again, Mohammed merely speculates that any ill treatment by Xia toward him must be because of Mohammed's race or skin color. Such speculation does not state a claim. *See Richardson*, 2 F.4th at 1068 ("Mere conclusory statements and factual allegations lacking enough specificity to raise a right to relief above the speculative level are insufficient to support a reasonable inference that the defendant is liable." (internal quotation marks and citations omitted)).

This is another instance in which Mohammed's own allegations set out "lawful, obvious alternative explanation[s] for the alleged [retaliatory] conduct," rendering Mohammed's theory of causation implausible. *Schottel*, 42 F.4th at 984; *Blomker*, 831 F.3d at 1059–60 (explaining that where a plaintiff's complaint includes reasons for adverse action that are unrelated to protected activity, those allegations make a causal connection implausible). Those allegations are that Mohammed did not pick up Xia's calls because Mohammed thought it was better to correspond by email, Filing No. 1 at 9 (¶¶ 74–78), missed an in-person meeting with Xia, Filing No. 1 at 10 (¶ 82), had been confrontational and threatening with Fu and Xia (even if Mohammed asserts those accusations are false), Filing No. 1 at 17, 21 (¶¶ 137–38, 158–59), and that he had a poor work ethic (again, even if Mohammed asserts that accusation was false), Filing No. 1 at 18 (¶ 141). Furthermore, for the same reasons that the Eighth Circuit has rejected the suggestion that allegations of "instances of a subordinate employee being subjected to

the criticism and control of a supervisor" are insufficient to generate an inference of discrimination, *Xuan Huynh*, 794 F.3d at 959, the Court concludes that such allegations do not standing alone generate an inference of causal connection between an individual's race or skin color and adverse action for purposes of a hostile environment claim.

Thus, Defendants are entitled to dismissal of Mohammed's Title VII hostile environment claim against the University in Count V for failure to state a claim upon which relief can be granted.

### D. The § 1981 and § 1983 Claims Against All Defendants in Counts III and VI

#### 1. Mohammed's § 1981 Claim

##### a. The Claim

Count III is captioned, "42 U.S.C. § 1981 Retaliation (Against all Defendants)." Filing No. 1 at 29 (emphasis omitted). In support of this claim, Mohammed alleges essentially the same things as he did in his NFEPA retaliation claim in Count II. *Compare* Filing No. 1 at 28 (¶¶ 195–97), *with* Filing No. 1 at 18 (¶¶ 202–04). Because the parties' briefing on the Motion to Dismiss demonstrates some confusion about the nature of this claim, the Court will set out the pertinent allegations in their entirety:

> 202. Plaintiff engaged in protected conduct when they complained about race-based discrimination.

> 203. Defendants subjected Plaintiff to adverse employment actions after Plaintiff engaged in protected conduct, including termination and a change in how they [sic] could perform their [sic] duties when compared to similarly situated employees. Defendants also made false reports about Plaintiff.

> 204. There was a causal connection between the protected conduct and the adverse action.

> 205. As a direct and proximate result of these actions, Plaintiff has suffered financial and physical well-being damages.

206. After reporting instances of discrimination, Plaintiff has been fired by Creighton University, directly demonstrating retaliation.

207. Defendants, therefore, are liable for the damages caused approximately [sic] resulting from its [sic] retaliation.

Filing No. 1 at 28–29 (¶¶ 202–07).

### b. The Parties' Arguments

Defendants mischaracterize Mohammed's claim in Count III as "a Section 1981 race discrimination claim." Filing No. 17 at 22. However, as indicated above, the claim is explicitly a § 1981 retaliation claim and pleads the elements of a retaliation claim. Filing No. 1 at 28 (identifying the claim as "42 U.S.C. § 1981 Retaliation), 28–20 (¶¶ 202–07). Mohammed also apparently forgot that his § 1981 claim was a retaliation claim, because he frames his response entirely in terms "race discrimination under 42 U.S.C. § 1981." Filing No. 18 at 15.[4] He then responds to Defendants' arguments about the sufficiency of the pleading of his § 1981 discrimination claim even though no such claim is pleaded. Filing No. 18 at 16.

Belatedly recognizing their mistake, Defendants argue in reply that Mohammed's claim "is specifically for retaliation under § 1981." Filing No. 19 at 10. Defendants argue that because Mohammed pleads the same protected conduct of reporting race discrimination under his NFEPA claim as his § 1981 claim, the court may treat the two retaliation claims as one. Filing No. 19 at 10. This is an entirely new argument raised for the first time in a reply brief. Furthermore, it is not responsive to new or unexpected arguments by Mohammed, whose response had mistakenly followed Defendants' opening arguments by addressing a phantom § 1981 race discrimination claim.

---

[4] Strangely, Mohammed also cites a Nebraska Supreme Court decision for the standards under Fed. R. Civ. P. 12(b)(6) for pleading of this claim. Filing No. 18 at 15.

Consequently, the Court considers Defendants' new arguments concerning a § 1981 retaliation claim to be waived. *See United States v. Cooper*, 990 F.3d 576, 583 (8th Cir. 2021) ("Ordinarily, a party's failure to make an argument in its opening brief results in waiver of that argument."); *Montin v. Moore*, 846 F.3d 289, 295 (8th Cir. 2017) ("Because [c]laims not raised in an opening brief are deemed waived, and [appellant] failed to address the . . . claim in his opening brief, [appellant] waived this issue." (cleaned up)).

### c. Mohammed's § 1981 Retaliation Claim is Fatally Flawed

Despite the Defendants' failure to raise a fatal flaw in Mohammed's § 1981 retaliation claim, and Mohammed's failure to respond to any such fatal flaw, "a district court *sua sponte* may dismiss a complaint under Rule 12(b)(6) as long as the dismissal does not precede service of process." *Buckley v. Ray*, 848 F.3d 855, 867 n.9 (8th Cir. 2017). Furthermore, dismissal *sua sponte* without notice to the plaintiff is not reversible error "when it is patently obvious the plaintiff could not prevail based on the facts alleged in the complaint." *Smith v. Boyd*, 945 F.2d 1041, 1043 (8th Cir. 1991).

The fatal flaw here[5] is that Mohammed's § 1981 retaliation claim is a "freestanding" § 1981 claim that makes no reference to being raised through 42 U.S.C. § 1983. *See* Filing No. 1 at 28–29. In *Onyiah v. St. Cloud State Univ.*, 5 F.4th 926 (8th Cir. 2021), the Eighth Circuit rejected an appeal asserting that "freestanding § 1981 claims" had been wrongly dismissed on a Fed. R. Civ. P. 12(b)(6) motion. The Eighth Circuit explained,

> The district court held Onyiah was barred from asserting § 1981 retaliation claims against state actors. *See Artis [v. Francis Howell North Band Booster Ass'n]*, 161 F.3d [1178], 1182 [(8th Cir. 1998)] ("A federal action to enforce rights under § 1981 against a state actor may only be brought pursuant to § 1983."). Onyiah views the rule in *Artis* as dicta and says that case relied on a Supreme Court opinion, *Jett v. Dallas Independent School District*, 491

---

[5] Another potential flaw with this claim is that none of the Defendants is a state actor, but the Court will address that issue below in the context where Defendants asserted it.

U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), which he maintains was overruled when Congress amended § 1981 through the Civil Rights Act of 1991, Pub.L. 102-166, 105 Stat. 1071. Onyiah urges us to follow the approach adopted by our sister circuit, which held "that the amended ... § 1981 contains an implied cause of action against state actors, thereby overturning *Jett's* holding that ... § 1983 provides the exclusive federal remedy against state actors for the violation of rights under ... § 1981." *Fed'n of Afr. Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1214 (9th Cir. 1996). Under our precedent, we cannot reach the same conclusion. *See Flowers v. City of Minneapolis*, 558 F.3d 794, 800 (8th Cir. 2009) ("*[B]ecause* [the plaintiff] may pursue a § 1981 claim against the City only through § 1983 ... the district court properly dismissed [the plaintiff's] claim against the City under § 1981.") (emphasis added); *accord Campbell v. Forest Pres. Dist. of Cook Cnty.*, 752 F.3d 665, 671 (7th Cir. 2014) ("We now join the overwhelming weight of authority and hold that Jett remains good law, and consequently, § 1983 remains the exclusive remedy for violations of § 1981 committed by state actors.").

Since Artis, we have repeatedly recognized the prohibition on freestanding § 1981 claims against state actors. *See Jones v. McNeese*, 746 F.3d 887, 896 (8th Cir. 2014); *Flowers*, 558 F.3d at 800; *Lockridge v. Bd. of Trs. of U. of Ark.*, 315 F.3d 1005, 1007 (8th Cir. 2003) (en banc). Onyiah suggests these statements were dicta. But this is not true of *Flowers*, where our holding depended on applying the rule prohibiting direct § 1981 claims against state actors. 558 F.3d at 800. Onyiah's argument is therefore foreclosed. *See Mader v. United States*, 654 F.3d 794, 800 (8th Cir. 2011) (en banc) (noting the cardinal rule that a panel must follow a prior panel's holding). The district court correctly dismissed Onyiah's freestanding § 1981 claims.

*Onyiah*, 5 F.4th at 929–30.

There can be little doubt that the Eighth Circuit's decision in *Onyiah* forecloses Mohammed's § 1981 retaliation claim in Count III, where it is plainly a "freestanding" § 1981 claim. *Onyiah*, 5 F.4th at 929–30 (describing a § 1981 claim that is not brought under § 1983 as "freestanding"). The decision in *Onyiah* establishes a bright-line rule that a § 1981 claim is barred if it is not explicitly brought under the exclusive remedy of § 1983. *Id.* at 929. Mohammed's § 1981 lacks any reference to that exclusive remedy.

Therefore, Defendants are entitled to dismissal of Mohammed's § 1981 retaliation claim in Count III because it is an improper "freestanding" § 1981 claim.

### 2. Mohammed's § 1983 Claim in Count VI

#### a. The Claim

Count VI of Mohammed's Complaint is captioned, "42 U.S.C. § 1983 Unconstitutional Official Policy; Failure to Investigate, Supervise and Train (Against all Defendants)." Filing No. 1 at 32 (emphasis omitted). The gravamen of this claim is the following:

> 222. Defendant Creighton University, by and through its policy makers, failed to ensure through custom, policy and/or practice or training that its employees and supervisors would obey, follow, and otherwise and abide by appropriate protocol and procedures regarding discrimination in the workplace and other violations of civil rights and failed to properly investigate complaints or incidents of such unlawful conduct by its employees.

Filing No. 1 at 32 (¶ 222). This claim alleges further that "[s]uch failures . . . were conducted under color of state law. . .." Filing No. 1 at 32 (¶ 224).

#### b. The Parties' Arguments

Defendants argue that this claim should be dismissed as to all Defendants because Defendants are all private parties—rather than state actors—so that they cannot be held liable for a § 1983 claim. Filing No. 17 at 7. Defendants argue that nothing alleged in Mohammed's Complaint plausibly suggests that the conduct of any Defendant should be characterized as "state action." *Id.* at 8. They assert that the University is a non-profit private university and that the two individual Defendants are private individuals. *Id.* Defendants argue that the only allegation relating to Defendants as possible state actors or their conduct as possible state action is that the conduct was done "under color of state law. . .." *Id.* (quoting Filing No. 1 at 32 (¶ 224)). However, Defendants argue that looking at the Complaint as a whole and construing the factual allegations in the light

most favorable to Mohammed, he has alleged "nothing more than private conduct outside of the remedial scope of Section 1983." Filing No. 17 at 9.

Mohammed argues that Defendants' conduct qualifies as state action under the applicable legal standard. Filing No. 18 at 4. He argues that a private entity can be considered a state actor when it performs a traditional, exclusive public function, when the government compels the private entity to take a particular action, or when the government acts jointly with the private entity. *Id.* He argues that the University is "intertwined with state functions and receives significant state funding," which creates a close enough nexus between the state and the conduct he challenges for the conduct to be actionable under § 1983. *Id.* More specifically, he points to the University's participation in the Nebraska State Grant Program, *id.*; the receipt by the University's faculty of substantial extramural funding for research, including National Institutes of Health (NIH) grants, *id.* at 5; collaboration between the University and Wayne State College in joint educational initiatives, *id.*; and performance of functions "traditionally and exclusively public, such as providing education and research services." *Id.* at 6.

In reply, Defendants point out that Mohammed did not plead any of the additional facts he relies on in his brief to show that the University is a state actor. Filing No. 19 at 2. Furthermore, Defendants argue that state action is not necessarily present merely because an entity is funded in whole or in part by the state or subject to state regulation. *Id.* at 3. Defendants also argue that Mohammed has cited no authority (and alleged no facts) demonstrating that education and research or both are traditionally and exclusively performed by the state. *Id.* at 4.

### c. Mohammed Has Not Pleaded Defendants are "State Actors"

#### i. "State Actor Standards"

"Section 1983 provides a cause of action against a defendant whose actions were taken 'under color of state law' and deprived another of a federal right." *Todd v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 5*, 125 F.4th 1214, 1217 (8th Cir. 2025) (quoting *Lugar v. Edmondson Oil Co.*, 102 S. Ct. 2744 (1982)). Thus, "[t]o state a claim under § 1983, a plaintiff must allege sufficient facts to show (1) that the defendant(s) acted under color of state law, and (2) that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." *Roberson v. Dakota Boys & Girls Ranch*, 42 F.4th 924, 928 (8th Cir. 2022) (internal quotation marks and citations omitted). In short, "[o]nly a state actor can face § 1983 liability for acting under color of state law." *Id.* (internal quotation marks and citation omitted).

"A private entity is considered a state actor in only limited circumstances, where the disputed acts have their source in state authority." *Todd*, 125 F.4th at 1217 (internal quotation marks and citations omitted). Whether a person or entity commits "state action" is "necessarily a fact-bound inquiry." *Roberson*, 42 F.4th at 928 (internal quotation marks and citation omitted). Courts consider two questions: (1) "whether the claimed deprivation resulted from the exercise of a right or privilege having its source in state authority," *id.* (quoting *Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007)); and (2) "whether the party engaging in the deprivation may be appropriately characterized as a state actor," *id.* (quoting *Wickersham*, 481 F.3d at 597). The second question is answered in the affirmative "in a few circumstances, including when (1) the private entity performs

a traditional, exclusive public function, or (2) the government acts jointly with the private entity." *Id.* at 928–29 (internal quotation marks and citations omitted).

ii.    *Mohammed's Arguments Are Not Reflected in His Pleadings*

On a Fed. R. Civ. P. 12(b)(6) motion to dismiss, "[a] claim survives . . . only if the complaint's nonconclusory allegations, accepted as true, make it not just 'conceivable' but 'plausible' that the defendant is liable." *Mitchell*, 28 F.4th at 895 (quoting *Iqbal*, 556 U.S. at 680–83).  In making that determination, the Court considers "only the complaint and materials that are 'necessarily embraced by the pleadings and exhibits attached to the complaint.'" *Meardon v. Reg.*, 994 F.3d 927, 934 (8th Cir. 2021) (quoting *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003)).  Evidence or statements outside of the complaint, including factual statements in briefs, are generally not considered.  *See Glow In One Mini Golf, LLC v. Walz*, 37 F.4th 1365, 1370 (8th Cir. 2022); *Hawse v. Page*, 7 F.4th 685, 691 (8th Cir. 2021) (explaining that a party cannot amend its complaint, or supplement insufficient factual allegations, in a brief filed in opposition to a motion to dismiss (citing *Morgan Distrib. Co. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989)).

Here, factual allegations supporting Mohammed's argument that Defendants are state actors are found only in his brief in opposition to Defendants' Motion to Dismiss but are wholly absent from his Complaint.  *Compare* Filing No. 18 at 4–7, *with* Filing No. 1 *passim*.  Certainly, a conclusory allegation that Defendants' "failures to investigate, train, and supervise were conducted under color of state law," Filing No. 1 at 32 (¶ 224), is inadequate to defeat a motion to dismiss for failure to state a claim.  *See Richardson*, 2 F.4th at 1068 ("Mere conclusory statements and factual allegations lacking enough

specificity to raise a right to relief above the speculative level are insufficient to support a reasonable inference that the defendant is liable." (internal quotation marks and citations omitted)).  Mohammed has not pointed to—and the Court has not found—in his Complaint any factual allegations plausibly suggesting either (1) that "the claimed deprivation resulted from the exercise of a right or privilege having its source in state authority," or (2) that "the party engaging in the deprivation may be appropriately characterized as a state actor."  *Roberson*, 42 F.4th at 928 (internal quotation marks and citation omitted).  Still more specifically, Mohammed has not pointed to—and the Court has not found—in his Complaint any allegations that Defendants performed a traditional, exclusive public function or that they acted jointly with the state government. *Id.* at 928–29.  Indeed, Mohammed fails even to cite any legal authority that either education or research services are "traditionally and exclusively" the province of the state.  *Contra* Filing No. 18 at 6.

Therefore, Defendants are entitled to dismissal of Mohammed's § 1983 claim in Count VI.

### E.  The State Common-Law Claims

Mohammed's last three claims assert causes of action under Nebraska common law.  Defendants assert that these Counts also fail to state claims upon which relief can be granted.  28 U.S.C. § 1367(a) provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." However, a federal district court has discretion to decline to

exercise supplemental jurisdiction if the court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). As the Eighth Circuit has explained,

> A district court has broad discretion to decline to exercise supplemental jurisdiction over state law claims after all claims over which the district court had original jurisdiction have been dismissed. *See Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 359 (8th Cir. 2011). "In exercising its discretion, the district court should consider factors such as judicial economy, convenience, fairness, and comity." *Brown v. Mortg. Elec. Registration Sys., Inc.*, 738 F.3d 926, 933 (8th Cir. 2013); *see also* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction.").

*Elmore v. Harbor Freight Tools USA, Inc.*, 844 F.3d 764, 767 (8th Cir. 2016). Declining to exercise supplemental jurisdiction may be particularly appropriate when "the case [i]s in the nascent stages" at the time of dismissal of all federal claims. *Id.*

In this case, the Court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1365(c)(3). Thus, the Court has "broad discretion to decline to exercise supplemental jurisdiction over [Mohammed's remaining] state law claims." *Elmore*, 844 F.3d at 767. Consideration of the appropriate factors does not suggest any reason to continue to exercise supplemental jurisdiction, where there will be no significant judicial economy in directing Mohammed's remaining claims to state court at this "nascent stage" of the proceedings, whereas comity warrants letting the state court determine remaining questions of state common law. *Id.* Furthermore, convenience or fairness do not counsel against declining to exercise supplemental jurisdiction where all parties are or were at relevant times citizens or residents of Nebraska. *See* Filing No. 1 at 1–2 (¶¶ 5–8) (alleging citizenship or residence of the parties). Thus, on balance, the relevant factors support declining to exercise supplemental jurisdiction over Mohammed's remaining state law claims after dismissal of his federal claims.

## III.    CONCLUSION

THEREFORE, IT IS ORDERED that this case is dismissed in its entirety as follows:

1.      Defendants' Motion to Dismiss, Filing No. 16, is granted as to Mohammed's federal and state statutory claims in Counts I through VI, and those claims are dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state claims upon which relief can be granted;

2.      Defendants' Motion to Dismiss, Filing No. 16, is denied as moot as to Mohammed's state common-law claims in Counts VII, VIII, and IX; and

3.      The Court declines to exercise supplemental jurisdiction over Mohammed's state common-law claims in Counts VII, VIII, and IX pursuant to 28 U.S.C. § 1367(c)(3), and those claims are dismissed without prejudice.

4.      A separate Judgment shall enter accordingly.

Dated this 16th day of December, 2025.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge